# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 1:23-md-03083-ADB |
| This Document Relates To: | DIRECT FILED COMPLAINT & JURY DEMAND PURSUANT TO MDL ORDER NO. 12 |
| SUSAN ROMINE, PAUL BAADE, GARY BICKELL, TRICIA HERNANDEZ, JESSICA MENDEZ, PAUL PATRICK, MARGARET PHELAN, VICTOR ROBERT, ANNA SANGL, KENNETH WHITE, and CHARLES WILLIAMS, *individually and on behalf of all others similarly situated*, | CIVIL ACTION NO. |
| Plaintiffs, | |
| v. | |
| PROGRESS SOFTWARE CORPORATION; AETNA LIFE INSURANCE COMPANY; COREBRIDGE FINANCIAL; FULLSCOPERMS (f/k/a DISABILITY REINSURANCE MANAGEMENT SERVICES, INC.); GENWORTH LIFE AND ANNUITY INSURANCE COMPANY; GENWORTH LIFE INSURANCE COMPANY; GENWORTH FINANCIAL, INC.; THE HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY; PENSION BENEFIT INFORMATION, LLC (d/b/a PBI RESEARCH SERVICES); RELIASTAR LIFE INSURANCE COMPANY; RELIASTAR LIFE INSURANCE COMPANY OF NEW YORK; and TEACHERS' INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, | |
| Defendants. | |

Plaintiffs Susan Romine, Paul Baade, Gary Bickell, Tricia Hernandez, Jessica Mendez,

Paul Patrick, Margaret Phelan, Victor Robert, Anna Sangl, Kenneth White, and Charles Williams

("Plaintiffs") individually and on behalf of all others similarly situated, upon personal knowledge

of facts pertaining to themselves against Defendants Progress Software Corporation ("PSC"),

Aetna Life Insurance Company ("Aetna"), Corebridge Financial, Fullscope RMS (f/k/a Disability

Reinsurance Management Services, Inc.) ("DRMS"), Genworth Life and Annuity Insurance

Company, ("GLAIC"), Genworth Life Insurance Company ("GLIC"), Genworth Financial, Inc.

("Genworth Financial" and collectively with GLAIC and GLIC, "Genworth"), The Hartford Life

and Accident Insurance Company ("The Hartford"), Pension Benefit Information LLC d/b/a PBI

Research Services ("PBI"), ReliaStar Life Insurance Company ("RLIC"), ReliaStar Life Insurance

Company of New York ("RLINY" and together with RLIC, "ReliaStar"), and Teachers' Insurance

and Annuity Association of America ("TIAA"), (collectively, "Defendants"), and in support

thereof alleges as follows:

## NATURE OF THE ACTION

1.      This Complaint is being directly filed into this MDL proceeding pursuant to the

Court's MDL Order No. 12.

2.      Plaintiffs incorporate the allegations contained in Plaintiffs' Omnibus Set of

Additional Pleading Facts (ECF No. 908) in its entirety.

3.      Plaintiffs bring this class action against Defendants on behalf of themselves and all

other individuals ("class members"), totaling more than 60 million people and nearly 1,000

organizations,[1] who had their sensitive personal identifiable information ("PII") and protected

health information ("PHI" and together with PII, "Personal Information")—as defined by the

Health Insurance Portability and Accountability Act ("HIPPA")—accessed and hacked by

---

[1] https://www.securityweek.com/nearly-1000-organizations-60-million-individuals-impacted-by-moveit-hack/.

malicious, unauthorized third parties that accessed and removed the Personal Information from Defendants' systems as early as May 27, 2023[2] (the "Data Breach").

4.     Defendants tout the safety and security of their services on their websites. PSC advertises itself as an "experienced, trusted provider of products designed with you, our customers, in mind. With Progress, you can build what you need, deploy where and how you want, empower your customers, then manage it all safely and securely."[3]

5.     Likewise, as alleged in greater detail below, all other Defendants make similar statements to consumers that the Personal Information that they entrust to Defendants will remain safe and secure.

6.     PSC offers both solutions and products, including its file transfer service called MOVEit, which "provides secure collaboration and automated file transfers of sensitive data and advanced workflow automation capabilities without the need for scripting. Encryption and activity tracking enable compliance with regulations such as PCI, HIPAA and GDPR."[4]

7.     Specifically, PSC describes MOVEit as a "managed file transfer software" that PSC claims is "leading secure Managed File Transfer (MFT) software used by thousands of organizations around the world to provide complete visibility and control over file transfer activities. Whether deployed as-a-Service, in the Cloud, or on premises, MOVEit enables your organization to meet compliance standards, easily ensure the reliability of core business processes, and secure the transfer of sensitive data between partners, customers, users and systems."[5]

---

[2] https://www.reuters.com/technology/hackers-use-flaw-popular-file-transfer-tool-steal-data-researchers-say-2023-06-02/; https://news.yahoo.com/another-calpers-retiree-sues-pbi-231108178.html.

[3] https://www.progress.com/company.

[4] https://www.progress.com/moveit.

[5] https://www.ipswitch.com/moveit?_ga=2.178322852.1251772019.1689781398-357640369.

8.      MOVEit is used by more than 1,700 software companies and 3.5 million users worldwide.[6]

9.      PSC's wholly-owned subsidiary, Ipswitch, Inc. ("Ipswitch"), developed MOVEit along with other products that "enable small and medium sized business and enterprises to provide secure data sharing and ensure high-performance infrastructure" and was acquired by PSC in 2019.[7]

10.     PSC's website states: [8]

[T]o comply with HIPAA, Progress operates secure computing environments in its corporate offices, development environments, and production cloud products. Each of these areas are equipped with security technologies, processes, and people needed to protect sensitive information. The Progress Internal Audit team audits use of security solutions and processes, evaluated by annual SOC2 assessments and validated by annual HIPAA audits. Copies of the SOC2 assessments and audit reports are available to our customers upon request. Progress corporate administration and human resources functions are also audited for HIPAA compliance on an annual basis.

11.     PSC's website states that "within our Sites, you may be asked to give us personal or organizational information in order to purchase or receive information about a Progress Property. We may collect this information through different methods."[9]

12.     PSC's website further states that "in some cases, end users of our customers may need to provide Sensitive Personal Information to our customer in order to make use of an

---

1688748444.

[6] https://www.jdsupra.com/legalnews/moveit-transfer-zero-day-vulnerability-9280864/#:~
:text=With%20more%20than%201%2C700%20software,unidentified%20threat%20actor%20gr
oups%20worldwide.

[7] https://investors.progress.com/news-releases/news-release-details/progress-acquire-ipswitch-
inc.

[8] https://www.progress.com/legal/hipaa-compliance-faqs.

[9] https://www.progress.com/legal/privacy-policy.

application that uses our Product or SaaS Product and that Sensitive Personal Information may be stored or processed by us as a result. We process such Sensitive Personal Information in the role of a processor on behalf of a customer (and/or its affiliates) who is the responsible controller of the Sensitive Personal Information concerned."[10]

13.     PSC's website explains:[11]

[T]he Personal Information collected by Progress Software may include, but is not necessarily limited to:
* Contact information (such as your name, title, e-mail address, postal address, and telephone number);
* Transactional information, including delivery details, including billing and delivery address where applicable;
* User preferences;
* IP address;
* Financial/credit card and payment information (please see the "Third Party Payment Processor" section for more information);
* Demographic information and geographic or geo-location information; and
* Additional information as needed for our business and customer service purpose.

14.     PBI is a pension plan "sponsor, administrator, or record keeper" "for thousands of organizations" and pension plans, and one of the many companies that uses PSC's MOVEit service to transfer large amounts of data in the ordinary course of its business and the service it provides to pension plans and other organizations.[12]

15.     On or around May 31, 2023, PSC purportedly discovered a vulnerability in its MOVEit Transfer and MOVEit Cloud systems that "could lead to escalated privileges and potential unauthorized access." On or about that same day, PSC purportedly notified all customers,

---

[10] *Id.*

[11] *Id.*

[12] https://www.pbinfo.com/.

and developed and released a security patch with 48 hours.[13] PSC assigned a severity rating of 9.8 out of 10 to this vulnerability.[14]

16.     On or around June 9, 2023, PSC and its contracted cybersecurity firm, Huntress, uncovered additional vulnerabilities "distinct from the previously reported vulnerability shared on May 31, 2023."[15]

17.     It has been reported that the Data Breach affecting PSC's MOVEit software is unique from most other recent data breaches because MOVEit is widely used, and the breach impacted both primary users of the software, as well as their contracted third parties that also use the software.[16]

18.     It has been reported that the Data Breach was a ransomware attack conducted by a notorious ransomware group, C10p, which claims to have committed the Data Breach.[17]

19.     C10p claims to have stolen Personal Information from over 1,000 organizations and 60 million individuals, including U.S. schools, U.S. public sector, and U.S. private sector.[18]

20.     C10p is a well-known ransomware group, which "[has] been linked to FIN11, a financially-motivated cybercrime operation" and is "connected to both Russia and Ukraine and which is believed to be part of a larger umbrella operation known as TA505."[19]

---

[13] https://www.progress.com/security/moveit-transfer-and-moveit-cloud-vulnerability.

[14] https://www.emsisoft.com/en/blog/44123/unpacking-the-moveit-breach-statistics-and-analysis/.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*; https://www.securityweek.com/nearly-1000-organizations-60-million-individuals-impacted-by-moveit-hack/.

[19] *Id.*

21.     It has been reported that C10p has requested unspecified ransom from the impacted organizations in exchange for C10p to abstain from releasing consumers' highly sensitive Personal Information. As of July 19, 2023, C10p and its hacking of MOVEit has resulted in the theft of more than 60 million individuals' sensitive information.[20] Because the Data Breach was conducted by known, self-proclaimed ransomware hackers, Plaintiffs' and class members' sensitive Personal Information are irrefutably in the possession of known bad actors.

22.     Defendants owed duties to Plaintiffs and class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Personal Information against unauthorized access and disclosure. Defendants breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the Personal Information entrusted to it from unauthorized access and disclosure.

23.     As a result of Defendants' inadequate security and breach of its duties and obligations, the Data Breach occurred and Plaintiffs' and class members' Personal Information was accessed by, and disclosed to, an unauthorized third-party actor. This instant action seeks to remedy these failings and their consequences. Plaintiffs thus bring this complaint on behalf of themselves, and all similarly situated individuals whose Personal Information was exposed as a result of the Data Breach, which PSC learned of on or about May 27, 2023, but did not publicly disclose until May 31, 2023.

24.     Plaintiffs, on behalf of themselves and all other class members, assert claims for negligence, negligence per se, invasion of privacy (intrusion upon seclusion) (public disclosure of

---

[20] https://www.securityweek.com/nearly-1000-organizations-60-million-individuals-impacted-by-moveit-hack/.

private facts), breach of implied contract, breach of third-party beneficiary contract, unjust enrichment, violations of the Illinois Personal Information Protection Act (815 ILCS 530/10(a)), Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, *ET SEQ*), Illinois Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. §§ 510/2, et seq.), Massachusetts General Laws, Ch. 93A, Michigan Identity Theft Protection Act (Mich. Comp. Laws Ann. §§ 445.72, et seq.), New Jersey Consumer Fraud Act (N.J. Stat. §§ 56:8-1 et seq.), North Carolina Unfair Deceptive Trade Practices Act (N.C. Gen. Stat. §§ 75-1.1, et seq.), Ohio Consumer Sales Practices Act (Ohio Rev. Code § 1345.01, et seq.), Ohio Deceptive Trade Practices Act (Ohio Rev. Code § 4165.01, et seq.), and Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. §§ 201-1-201-9.3), and seeks declaratory and injunctive relief, monetary damages including punitive damages, equitable relief, and all other relief authorized by law.

## **PARTIES**

25.     Plaintiff Paul Baade ("Plaintiff Baade") is a resident and citizen of the state of Michigan and resides in Muskegon, Michigan.

26.     Plaintiff Gary Bickell ("Plaintiff Bickell") is a resident and citizen of the state of Michigan and resides in Canton, Michigan.

27.     Plaintiff Tricia Hernandez ("Plaintiff Hernandez") is a resident and citizen of the state of Texas and resides in Groves, Texas.

28.     Plaintiff Jessica Mendez ("Plaintiff Mendez") is a resident and citizen of the state of New Jersey and resides in East Brunswick, New Jersey.

29.     Plaintiff Paul Patrick ("Plaintiff Patrick") is a resident and citizen of the state of Ohio and resides in Mount Vernon, Ohio.

30.     Plaintiff Margaret Phelan ("Plaintiff Phelan") is a resident and citizen of the state of New Jersey and resides in Hoboken, New Jersey.

31.     Plaintiff Victor Robert ("Plaintiff Robert") is a resident and citizen of the state of Michigan and resides in Marine City, Michigan.

32.     Plaintiff Susan Romine ("Plaintiff Romine") is a resident and citizen of the state of Massachusetts and resides in Plymouth, Massachusetts.

33.     Plaintiff Anna Sangl ("Plaintiff Sangl") is a resident and citizen of the state of Pennsylvania and resides in Pittsburgh, Pennsylvania.

34.     Plaintiff Kenneth White ("Plaintiff White") is a resident and citizen of the state of Illinois and resides in Chicago, Illinois.

35.     Plaintiff Charles Williams ("Plaintiff Williams") is a resident and citizen of the state of North Carolina and resides in Denver, North Carolina.

36.     Defendant PSC is a Delaware corporation and maintains its headquarters and principal place of business in Burlington, Massachusetts. PSC offers the service MOVEit, which experienced the Data Breach underlying Plaintiffs' claims.

37.     Defendant PBI is a for-profit Delaware corporation with its principal place of business in Minneapolis, Minnesota. PBI uses PSC's MOVEit service in the regular course of its business acting as a pension plan "sponsor, administrator, or record keeper" "for thousands of organizations" and pension plans.[21]

38.     Defendant Aetna is a Connecticut corporation with its principal place of business in Hartford, Connecticut.

---

[21] https://www.pbinfo.com/.

39.     Defendant Corebridge Financial, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.

40.     Defendant DRMS is a for-profit third-party administrator, with its principal place of business in Portland, Maine.

41.     Defendant Genworth Financial is a publicly traded Fortune 500 company Delaware corporation with its principal place of business in Richmond, Virginia. Genworth Financial markets mortgage, long-term care insurance, life insurance, and other insurance and financial products, primarily to individual consumers.[22]

42.     Defendant GLAIC is a subsidiary of Genworth Financial with its principal place of business in Richmond, Virginia.

43.     Defendant GLIC is a subsidiary of Genworth Financial with its principal place of business in Richmond, Virginia.

44.     Defendant The Hartford is a national insurance company with its principal place of business in Hartford, Connecticut.

45.     Defendant RLIC is a life insurance company with its principal place of business in Minneapolis, Minnesota.  It is a subsidiary of Voya Financial, Inc.[23]

46.     Defendant RLINY is a life insurance company with its principal place of business in Woodbury, New York.[24] It is a subsidiary of Voya Financial, Inc.

47.     Defendant TIAA is a New York based stock insurance company with its principal place of business in New York, New York. TIAA provides services to over 5 million clients from

---

[22] GENWORTH FINANCIAL SERVICES, INC., *SEC Form 10-K* (FY 2022).

[23] https://www.voya.com/article/insurance-company-information.

[24] *Id.*

more than 15,000 institutions and manages nearly $1 trillion in assets with holdings in more than 50 countries.

## JURISDICTION AND VENUE

48.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000) and is a class action in which one or more class members are citizens of states different from Defendants.

49.     Absent the Court's MDL Order No. 12 (Direct Filing Order), Plaintiffs would have otherwise filed the case in each district court noted below, with the following bases:

50.     Plaintiffs would have filed his action in the United States District Court for the District of Minnesota, which has personal jurisdiction over Plaintiff's claims against Defendants because Defendants and their affiliates conduct business in the State of Minnesota that establish sufficient minimum contacts with the District of Minnesota and committed acts therein that give rise to Plaintiff's claims in this action—including but not limited to transferring, storing, or otherwise maintaining Plaintiff's Personal Information in Minnesota and/or engaging in conduct or failing to take steps in Minnesota to prevent the Data Breach, such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. The District of Minnesota is the proper venue for Plaintiff's claims pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in that District and Defendants have harmed Class Members residing in that District.

## FACTUAL ALLEGATIONS

**A.      Overview of Defendants**

51.      The Common Statement of Facts sets out the nature of Defendant PSC's business, including its MOVEit software.

52.      MOVEit is used by more than 1,700 companies and 3.5 million users worldwide.[25]

53.      Similar to various statements on PSC's website assuring consumers that PSC will protect their sensitive Personal Information, PBI's website also promises consumers that it has robust systems and processes in place to protect and secure their sensitive information:



---

[25] https://www.jdsupra.com/legalnews/moveit-transfer-zero-day-vulnerability-9280864/#:~:text=With%20more%20than%201%2C700%20software,unidentified%20threat%20actor%20groups%20worldwide.

> PBI uses a multi-layered approach to protect data securely that includes, but is not limited to the following: implementing secure development practices, including annual training for our IT team, real time scanning of code changes for vulnerabilities, web application firewalls, n-tier application architecture, required security awareness training program for all employees at onboarding and on a regular basis, data loss prevention tools to alert and block transfers of sensitive data, and a consolidated SIEM solution that correlates alerts and events across multiple environments. PBI's data security team manages this multi-layered security architecture by performing over 30 security reviews of quarterly audit checks to test compliance against security policies.
>
> PBI's formalized security program follows the industry-recognized security policy frameworks from the National Institute of Science & Technology (NIST) SP 800-53 and NIST Cybersecurity Framework.
>
> **SOC2 Audit and Third-party Security Testing**
> PBI undergoes an annual SSAE 18 SOC 2, Type II audit by an independent third-party to audit our controls over data confidentiality, integrity, security, and availability.
>
> PBI regularly uses third parties to test and audit our security controls. We conduct monthly and quarterly vulnerability assessments and penetration tests of PBI's internal and external network and application security, and conduct annual application penetration tests.

54.     PBI's website also tells consumers that it has systems and process in place to ensure the privacy of their sensitive information obtained over the internet and to prevent identity theft:

> **9. ONLINE PRIVACY**
>
> PBI strives to protect the privacy of personally identifiable information obtained over the Internet and strives to apply the Principles and evolving standards to the online environment.
>
> **10. IDENTITY THEFT**
>
> PBI strives to prevent the acquisition of information from our products and services for improper purposes, such as identity theft. PBI believes in the importance of notifying individuals who may have had their sensitive personally identifiable information acquired by an unauthorized individual, as appropriate.

55.     Furthermore, PBI acknowledges that it has a duty to safeguard Plaintiffs' and class members' sensitive Personal Information because, *inter alia*, PBI's website tells consumers that it has systems in place to protect consumers' sensitive information, and routinely audits those

systems to ensure they are compliant with federal regulations and other legislation—as well as industry standards and practices— governing data privacy:

**8. ACCOUNTABILITY**

PBI supports accountability of information industry standards and practices, responsible and effective federal regulation of the data industry, and legislation governing the practices of all data providers. PBI also supports industry oversight and active engagement with the privacy community. PBI believes that strong privacy and information security protections are vital for an effective and trusted data industry.

**11. COMPLIANCE**

PBI will obtain assessments from an independent auditor, who uses procedures and standards generally accepted in the profession to assess PBI's controls relevant to security, availability, and confidentiality, as appropriate.

56.     Likewise, the main page of PBI's website states: "Confidence Your Data is Secure: Protecting and securing your information is our highest priority. Our formalized security program follows industry-recognized security frameworks and undergoes an annual SSAE 18 SOC 2, Type II audit.[26]

57.     Defendant TIAA is a financial services and insurance company that services roughly 5 million clients from over 15,000 organizations across the United States.

58.     In the course of collecting Personal Information from its clients, including Plaintiffs, Defendant TIAA promised to provide confidentiality and adequate security for client data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

59.     Indeed, Defendant TIAA's Privacy Notice provides that:

TIAA protects the personal information you provide against unauthorized access, disclosure, alteration, destruction, loss, or misuse. Your personal information is protected by physical, electronic, and procedural safeguards in accordance with federal and state standards. These safeguards include appropriate procedures for

---

[26] https://www.pbinfo.com/.

access and use of electronic data, provisions for the secure transmission of sensitive personal information on our website, and telephone system authentication procedures. Additionally, we limit access to your personal information to those TIAA employees and agents who need access in order to offer and provide products or services to you. We also require our service providers to protect your personal information by utilizing the privacy and security safeguards required by law.[27]

60.     In the course of their relationship, clients, including Plaintiff and Class Members, provided Defendant TIAA, directly or indirectly, with at least the following PII: names; gender; date of birth; Social Security numbers; and addresses.

61.     Defendant Aetna Life Insurance Company is a life insurance company. In the course of collecting Personal Information from its clients, including Plaintiff, Defendant Aetna promised to provide confidentiality and adequate security for client data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

62.     Aetna's Privacy Notice states that it "seek[s] to use technical, administrative and physical security measures to protect your personal information from unauthorized access, disclosure, use or changes" and that it "regularly review[s] [its] security practices. We test our apps regularly to mimic attempts to breach our security. We also have robust disaster recovery plans in place."[28]

63.     In the course of their relationship, clients, including Plaintiffs and Class members, provided Defendant Aetna, directly or indirectly, with at least the following PII: names; gender; date of birth; Social Security numbers; and addresses.[29]

---

[27] https://www.tiaa.org/public/support/privacy/privacy-notice.

[28] *How Do We Protect Your Information*, https://www.aetna.com/legal-notices/privacy.html#tab_content_section_responsivegrid_copy_responsivegrid_tabs_link_tabs_1.

[29] *What Types of Information Do We Collect?*, https://www.aetna.com/legal-notices/privacy.html#tab_content_section_responsivegrid_copy_responsivegrid_tabs_link_tabs_1.

64.     Defendant Corebridge is "one of the largest providers of retirement solutions and insurance products in the United States."[30]

65.     Former and current Corebridge customers are required to entrust Defendants with sensitive, non-public PII, without which Defendants could not perform their regular business activities, in order to obtain insurance, financial, and/or other services from Corebridge. Defendants retain this information for at least many years and even after the consumer relationship has ended.

66.     Corebridge's Privacy Policy provides that: "[t]o protect your Personal Information, Corebridge Financial will take appropriate technical, physical, legal and organizational measures, which are consistent with applicable privacy and data security laws."[31]

67.     Defendant DRMS uses PBI to help pay life insurance and related benefits.[32]

68.     On or around July 17, 2023, PBI informed DRMS that "one of its servers was accessed by an unauthorized third party as part of the global attack. Because of this, some U.S. personal member information [DRMS] [] shared with PBI to support our businesses has been accessed."[33] It further stated that PII, including name, Social Security number, policy/account number, and/or date of birth was compromised in the Data Breach.[34]

69.     Defendant Genworth's website warrants to consumers that:

---

[30] https://www.corebridgefinancial.com/who-we-are.

[31] https://www.corebridgefinancial.com/privacy-policy (last visited Aug. 11, 2023).

[32] https://www.fullscoperms.com/en/moveit-cyber-incident/.

[33] *Id.*

[34] *Id.*

> [W]e use procedures and technologies designed to prevent unauthorized access to your personal information and to protect against the loss, misuse, and alteration of information under our control. We maintain physical, electronic, and procedural protections to protect personal information in accordance with applicable standards.[35]

Genworth explicitly states:

> We require that service providers who have access to your personal information implement similar standards. We require service providers to agree to keep your personal information confidential. Service providers who violate our privacy terms are subject to having their contract terminated.[36]

70.     Defendant The Hartford offers life, health, home, business, and accident insurance to individuals, families, groups, and businesses around the word.[37]

71.     The Hartford's privacy statement explains: "We work to adopt reasonable physical, administrative, and technical safeguards to protect the personal information transmitted between users and the Services and the personal information stored on our servers, and we require third parties with whom we share personal information to use reasonable precautions to safeguard such information."[38]

72.     Defendant ReliaStar is a subsidiary of Voya Financial Inc., and ReliaStar companies use DRMS as a claims administrator for disability claims. Voya Financial, Inc.'s privacy notice claims: "To protect your personal information from unauthorized access and use, we use security measures that comply with state and federal law. These measures include computer safeguards and secured files and buildings."[39]

---

[35] https://www.genworth.com/online-privacy-policy.html.

[36] *Id.*

[37] *The Hartford Life and Accident Insurance Company Files Notice of Data Breach Impacting Thousands*, JDSupra, https://www.jdsupra.com/legalnews/the-hartford-life-andaccident-5426280/.

[38] *How We Protect Information*, https://www.thehartford.com/online-privacy-policy#protect.

[39] https://www.voya.com/privacy-notice.

73.     Through their provision of the foregoing services, Defendants obtain possession of customers'—including Plaintiffs' and class members'—highly sensitive Personal Information. Thus, in the regular course of their businesses, Defendants collect and/or maintain the Personal Information of consumers such as Plaintiffs and class members. That information ordinarily includes: (1) patient demographic information (such as patient name, guarantor name, parent/guardian name, address, email address, and date of birth); (2) Social Security Numbers ("SSNs"), (3) driver's license numbers or other state-issued ID numbers, (4) insurance information (payer name, payer contract dates, policy information including type and deductible amount and subscriber number); (5) medical and/or treatment information (dates of service, location, services requested or procedures performed, diagnosis, prescription information, physician names, and Medical Record Numbers); (6) billing and/or claims information (invoices, submitted claims and appeals, and patient account identifiers used by the provider); and (7) information of any parent, guardian, or guarantor. Defendants store this information digitally in the regular course of business.

74.     As evidenced by, inter alia, their receipt of the notice informing them that their Personal Information was compromised in the Data Breach, Plaintiffs' and class members' Personal Information was transferred using PSC's MOVEit service and/or they otherwise entrusted to Defendants their Personal Information, from which Defendants profited.

75.     Yet, contrary to Defendants' representations—by virtue of Defendants' admissions that they experienced the Data Breach that revealed the Personal Information of more than 60 million individuals—Defendants did not have adequate measures in place to protect and maintain sensitive Personal Information entrusted to them.[40] Instead, Defendants' websites wholly

_____

[40] https://news.yahoo.com/another-calpers-retiree-sues-pbi-231108178.html.

fail to disclose the truth: that Defendants lack sufficient processes to protect the Personal Information that is entrusted to them.

**B.     Defendants Aetna, Corebridge, Genworth, and RLINY Failed to Comply with FTC Guidelines**

76.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

77.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

78.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for

suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

79.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

80.     These FTC enforcement actions include actions against financial institutions, like Defendants Aetna, Corebridge, Genworth, and RLINY.

81.     As evidenced by the Data Breach, Defendants Aetna, Corebridge, Genworth, and RLINY failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Defendants Aetna, Corebridge, Genworth, and RLINY's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

82.     Defendants Aetna, Corebridge, Genworth, and RLINY were at all times fully aware of their obligation to protect the PII of their customers yet failed to comply with such obligations. Defendants Aetna, Corebridge, Genworth, and RLINY were also aware of the significant repercussions that would result from their failure to do so.

**C.     Defendants Aetna, Corebridge, Genworth, and RLINY Failed to Comply with the Gramm-Leach Bliley Act**

83.     Defendants Aetna, Corebridge, Genworth, and RLINY are financial institutions, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

84. The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

85. Defendants Aetna, Corebridge, Genworth, and RLINY collect nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, Defendants Aetna, Corebridge, Genworth, and RLINY were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq.*, and are subject to numerous rules and regulations promulgated on the GLBA statutes.

86. The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

87. Accordingly, Defendants Aetna, Corebridge, Genworth, and RLINY's conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

88. Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5.

They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Corebridge violated the Privacy Rule and Regulation P.

89.     Upon information and belief, Defendants Aetna, Corebridge, Genworth, and RLINY failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing that PII on its network systems as well as those of its vendors.

90.     Defendants Aetna, Corebridge, Genworth, and RLINY failed to adequately inform their customers that it was storing and/or sharing, or would store and/or share, the customers' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the customer relationship ended.

91.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified risk

assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

92.     As alleged herein, Defendants Aetna, Corebridge, Genworth, and RLINY violated the Safeguards Rule.

93.     Defendants Aetna, Corebridge, Genworth, and RLINY failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information and failed to monitor the systems of its vendors or verify the integrity of those systems.

94.     Defendants Aetna, Corebridge, Genworth, and RLINY violated the GLBA and its own policies and procedures by sharing the PII of Plaintiffs and Class Members with a non-affiliated third party without providing Plaintiffs and Class Members: (a) an opt-out notice, and (b) a reasonable opportunity to opt out of such disclosure.

**D.     Named Plaintiffs' Experiences**

**1.     *Plaintiff Paul Baade***

95.     Plaintiff Baade is a former health insurance policyholder with Aetna.

96.     Plaintiff Baade received a letter from PBI dated September 6, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [Aetna]," and experienced the Data Breach, which "may affect the security of some of [Plaintiff Baade's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an

investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.

**What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name and Social Security number.

97.     Thus, the letter states that PBI and Aetna possessed Plaintiff Baade's sensitive PII, including his name and Social Security number, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

98.     According to the letter, Progress, PBI and Aetna learned of the Data Breach as early as May 29-31, 2023, but waited more than three months before only PBI notified Plaintiff Baade that his highly sensitive PII was compromised in the Data Breach.

99.     In addition to their substantial delay in notifying Plaintiff Baade of the Data Breach, Defendants also put the burden on Plaintiff Baade to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors . . . and to report suspected identity theft incidents to the institution."

100.     Plaintiff Baade's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. In or about December 2023, seven separate fraudulent charges totaling approximate $550 were made on Plaintiff Baade's debit card issued by Service One Federal Credit Union. As a direct and proximate result of the Data Breach, Plaintiff Baade spent approximately 15-20 hours investigating those fraudulent charges, contacting One Federal Credit Union to dispute those charges and obtain a replacement debit card, contacting the Roosevelt Park Police Department to file a report about the fraudulent charges, researching the

Data Breach, contacting all three major credit bureaus to freeze his credit, and monitoring his accounts and credit for suspicious activity.

101.     Plaintiff Baade greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Baade is very careful about sharing his PII and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Baade stores any and all documents containing PII in a secure location and destroys any documents he receives in the mail that contain any PII or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff Baade diligently chooses unique usernames and passwords for his various online accounts, and takes steps to ensure his online accounts are secure and password-protected.

102.     Plaintiff Baade is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Baade to suffer fear, anxiety, and stress, which has been compounded by Defendants' three-plus-month delay in informing him of the fact that his PII, including his Social Security number, was acquired by known cybercriminals through the Data Breach.

103.     Plaintiff Baade anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Baade will continue to be at present and continued increased risk of identity theft and fraud for years to come.

104.     Plaintiff Baade has a continuing interest in ensuring that his PII, which  remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

105.     As a result of the Data Breach, Plaintiff Baade has already suffered—and is at an increased risk of further suffering—injury and/or damages, including but not limited to, the

unauthorized use of his stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of his personal data; lost property in the form of his compromised PII; and injury to his privacy. Additionally, as a direct result of the Data Breach, Plaintiff Baade now faces a substantial risk that unauthorized third parties will further misuse his PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Baade has (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm because he lost time he spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

106.    Plaintiff Baade experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Baade would compensate him for the foregoing redressable injuries. Further, Plaintiff

Baade seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of his PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

### 2.   *Plaintiff Gary Bickell*

107.    Plaintiff Bickell holds a long term care policy from GLIC.

108.    Plaintiff Bickell received a letter directly from GLIC dated July 31, 2023, which reported that "Genworth was recently notified by [PBI] that your personal information was involved in a data security even that took advantage of a vulnerability in the widely-used MOVEit file transfer software that PBI uses." The letter further stated:

> PBI is a third-party vendor that Genworth uses to satisfy regulatory obligations to scan various databases to determine whether a customer may have passed and triggered death benefits under a life insurance policy or annuity contract. We also use PBI to identify deaths that have occurred across our other lines of insurance, as well as the deaths of insurance agents to whom we pay commissions.

109.    In order to obtain a long term care policy from GLIC, Plaintiff Bickell was required to provide his PII, directly or indirectly, to Genworth, including his name, date of birth, Social Security number, and other sensitive information.

110.    Ten days prior, Plaintiff Bickell received a letter from PBI dated July 21, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [GLIC]," and experienced the Data Breach, which "may affect the security of some of [Plaintiff Baade's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an

investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded your data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.

**What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, date of birth, zip code, state of residence, role in policy/account (eg., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number.

111.    At the time that PSC disclosed the data breach—on or around May 31, 2023—Defendants PBI and Genworth retained Plaintiff Bickell's PII in its computer systems.

112.    Thus, the letter states that PBI and GLIC possessed Plaintiff Baade's sensitive PII, including his name and Social Security number, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

113.    In addition to its substantial delay in notifying Plaintiff Bickell of the Data Breach, Defendant Genworth also put the burden on Plaintiff Bickell to prevent any further harm resulting from the Data Breach by stating in the letter: "Please watch for a letter from PBI  . . . . If you have not received the mailing by August 15 . . . you can call Genworth [] to learn how to activate your credit protection services."

114.    Plaintiff Bickell greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Bickell is very careful about sharing his PII and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Bickel stores any and all documents containing PII in a secure location and destroys any documents he receives in the mail that contain any PII or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff Bickell

diligently chooses unique usernames and passwords for his various online accounts and takes steps to ensure his online accounts are secure and password protected.

115.    According to the letter, Defendant Genworth waited several months before it notified Plaintiff Bickell that his personal information was compromised in the Data Breach. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Bickell, who retains a vested interest in ensuring that his PII remains protected.

116.    Moreover, Defendant Genworth's disclosure amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Bickell of the Data Breach's critical facts. Without those details, Plaintiff Bickell's ability to mitigate harms resulting from the Data Breach is severely diminished.

117.    Plaintiff Bickell is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Bickell to suffer fear, anxiety, and stress, which has been compounded by Defendants' delay in informing him of the Data Breach but providing no key details of the Data Breach's occurrence.

118.    Plaintiff Bickell anticipates spending significant time and money on an ongoing basis to try to mitigate and address harm caused by the Data Breach. Moreover, Plaintiff Bickell will continue to be at present and continued risk of identity theft and fraud for years to come.

119.    Plaintiff Bickell has a continuing interest in ensuring that his PII, which  remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

120.    As a result of the Data Breach, Plaintiff Bickell has suffered—or is at an increased risk of suffering—injury and/or damages, including but not limited to, the unauthorized use of his stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of his personal data; lost property in the form of his compromised PII; and injury to his privacy. Additionally, as a direct result of the Data Breach, Plaintiff Bickell now faces a substantial risk that unauthorized third parties will further misuse his PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Bickell has (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm because he lost time he spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

121.    Plaintiff Bickell experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Bickell would compensate him for the foregoing redressable injuries. Further, Plaintiff Bickell seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to, requiring Defendant to take steps to monitor for, protect, and/or prevent misuse of his PII accessed by cybercriminals in the Data Breach, as well as to enact adequate data privacy/security practices.

### 3. *Plaintiff Tricia Hernandez*

122.    Plaintiff Hernandez holds a life insurance policy with GLAIC.

123.    Plaintiff Hernandez received a letter from GLAIC dated July 31, 2023, which stated that "Genworth was recently notified by [PBI] that your personal information was involved in a data security even that took advantage of a vulnerability in the widely-used MOVEit file transfer software that PBI uses."

124.    Plaintiff Hernandez received a letter from PBI dated July 21, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [GLAIC], or for a third party acting on their behalf."  The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded your data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.

**What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, date of birth, zip code, state of residence, role in policy/account (eg., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number.

125.   Thus, the letter states that PBI and Genworth possessed Plaintiff Hernandez's PII, including her name, Social Security number, and other identifying information, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

126.   According to the letter, Progress, PBI, and Genworth learned of the data breach as early as May 29-31, 2023, but waited more approximately two months before notifying Plaintiff Hernandez that her highly sensitive PII was compromised in the Data Breach.

127.   In addition to their substantial delay in notifying Plaintiff Hernandez of the Data Breach, Defendants put the burden on Plaintiff Hernandez to prevent any further harm resulting from the Data Breach by stating in the letter from PBI: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors . . . and to report suspected identity theft incidents to the institution."

128.   Plaintiff Hernandez's PII compromised in the Data Breach has already been misused by cybercriminals; indeed, as a consequence of the Data Breach, Plaintiff Hernandez received a notification from IDX identity theft protection, reporting that her PII was detected on the Dark Web. As a direct and proximate result of the Data Breach, Plaintiff Hernandez spent time registering for Kroll credit monitoring, researching the Data Breach and monitoring her accounts and credit for suspicious activity.

129.   Plaintiff Hernandez greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Hernandez is very careful about sharing her PII

and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Hernandez stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be used to compromise her identity and/or credit. Moreover, Plaintiff Hernandez diligently chooses unique usernames and passwords for her various online accounts, and takes steps to ensure her online accounts are secure and password-protected.

130.    Plaintiff Hernandez is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Hernandez to suffer fear, anxiety, and stress, which has been compounded by Defendants' several-month delay in informing her of the fact that her PII, including her Social Security number, was acquired by known cybercriminals through the Data Breach.

131.    Plaintiff Hernandez anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Hernandez will continue to be at present and continued increased risk of identity theft and fraud for years to come.

132.    Plaintiff Hernandez has a continuing interest in ensuring that her PII, which remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

133.    As a result of the Data Breach, Plaintiff Hernandez has suffered—or is at an increased risk of suffering—injury and/or damages, including but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses

spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Hernandez now faces a substantial risk that unauthorized third parties will further misuse ger PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Hernandez has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

134.    Plaintiff Hernandez experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Hernandez would compensate her for the foregoing redressable injuries. Further, Plaintiff Hernandez seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or

prevent misuse of her PII accessed by cybercriminals in the Data Breach, as well as enact adequate

data privacy/security practices.

### 4. *Plaintiff Jessica Mendez*

135.    Plaintiff Mendez has a retirement account with Corebridge.

136.    Plaintiff Mendez received a letter from PBI dated August 8, 2023, which states that

PBI "provides audit and address research services for insurance companies, pension funds, and

other organizations, including [Corebridge]," and experienced the Data Breach, which "may affect

the security of some of [Plaintiff Mendez's] information." The letter further states as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of
> MOVEit Transfer software disclosed a vulnerability in their software that had been
> exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course
> of our business operations to securely transfer files. PBI promptly launched an
> investigation into the nature and scope of the MOVEit vulnerability's impact on
> our systems. Through the investigation, we learned that the third party accessed one
> of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and
> downloaded data. We then conducted a manual review of our records to confirm
> the identities of individuals potentially affected by this event and their contact
> information to provide notifications. We recently completed this review and have
> concluded that your personal information was involved in the incident . . . .

> **What Information Was Involved?** Our investigation determined that your
> personal information was impacted by this event and may have included: name.
> Social Security number, policy/account number, date of birth, and/or address.

137.    Thus, the letter states that PBI and Corebridge possessed Plaintiff Mendez's

sensitive PII, including her name, Social Security number, and additional identifying information,

but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

138.    According to the letter, Progress, PBI, and Corebridge learned of the Data Breach

as early as May 29-31, 2023, but waited over two months before only PBI notified Plaintiff Mendez

that her highly sensitive PII was compromised in the Data Breach.

139.    In addition to their substantial delay in notifying Plaintiff Mendez of the Data

Breach, Defendants also put the burden on Plaintiff Mendez to prevent any further harm resulting

from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."

140.    Plaintiff Mendez's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft.  In or about November and December 2023, Plaintiff Mendez received multiple fraudulent PayPal requests that she transfer $400 and $1,000 to unknown individuals. As a direct and proximate result of the Data Breach, Plaintiff Mendez spent multiple hours researching the Data Breach, investigating those fraudulent transfer requests, contacting the major credit bureaus to freeze her credit, and monitoring her accounts and credit for suspicious activity.

141.    Plaintiff Mendez greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Mendez is very careful about sharing her PII and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Mendez stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be used to compromise her identity and/or credit. Moreover, Plaintiff Mendez diligently chooses unique usernames and passwords for her various online accounts, and takes steps to ensure her online accounts are secure and password-protected.

142.    Plaintiff Mendez is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Mendez to suffer fear, anxiety, and stress, which has been compounded by Defendants' several-month delay in informing her of the fact that her PII, including her Social Security number, was acquired by known cybercriminals through the Data Breach.

143.    Plaintiff Mendez anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Mendez will continue to be at present and continued increased risk of identity theft and fraud for years to come.

144.    Plaintiff Mendez has a continuing interest in ensuring that her PII, which remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

145.    As a result of the Data Breach, Plaintiff Mendez has already suffered—and is at an increased risk of further suffering—injury and/or damages, including but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Mendez now faces a substantial risk that unauthorized third parties will further misuse her PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Mendez has (1) suffered, or is at an increased risk

of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

146.     Plaintiff Mendez experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Mendez would compensate her for the foregoing redressable injuries. Further, Plaintiff Mendez seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of her PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

### 5. *Plaintiff Paul Patrick*

147.     Plaintiff Patrick was on long-term disability with ReliaStar.

148.     Plaintiff Patrick received a letter from PBI dated August 21, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [DRMS], which is the claims administrator for disability claims associated with [ReliaStar]" and experienced the Data Breach, which "may affect the security of some of [Plaintiff Patrick's] information. The letter states further as follows:

**What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one

of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.

**What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, and date of birth.

149.    Accordingly, the letter states that PBI, DRMS, and ReliaStar possessed Plaintiff Patrick's PII, including his name, social security number, and date of birth, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

150.    According to the letter, Progress, PBI, DRMS, and ReliaStar learned of the Data Breach as early as May 29-31, but waited approximately three months before only PBI notified Plaintiff Patrick that his highly sensitive PII was compromised in the Data Breach.

151.    In addition to their substantial delay in notifying Plaintiff Patrick of the Data Breach, Defendants also put the burden on Plaintiff Patrick to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors . . . and to report suspected identity theft incidents to the institution."

152.    Plaintiff Patrick's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. On or around February 7, 2023, Plaintiff Patrick was notified that an unauthorized party was making fraudulent charges on his credit card. Moreover, as a result of fraudulent activity regarding his taxes, the IRS had to issue Plaintiff Patrick a Personal Protection PIN. As a direct and proximate result of the Data Breach, Plaintiff Patrick spent approximately $50.00 in gas and $10.00 in parking when he traveled to the IRS. Further, he spent sixteen hours investigating those fraudulent charges, investigating the issue with

the IRS, researching the Data Breach; and monitoring his accounts and credit for suspicious activity.

153.     Plaintiff Patrick greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Patrick is very careful about sharing his PII and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Patrick stores any and all documents containing PII in a secure location and destroys any documents he receives in the mail that contain any PII or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff Patrick diligently chooses unique usernames and passwords for his various online accounts, and he takes steps to ensure his online accounts are secure and password protected.

154.     Plaintiff Patrick is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Patrick to suffer fear, anxiety, and stress, which has been compounded by Defendants' three-month delay in informing him of the fact that his PII, including his Social Security number, was acquired by known cybercriminals through the Data Breach.

155.     Plaintiff Patrick anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Patrick will continue to be at present and continued increased risk of identity theft and fraud for years to come.

156.     Plaintiff Patrick has a continuing interest in ensuring that his PII, which remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

157.     As a result of the Data Breach, Plaintiff Patrick has already suffered—and is at an increased risk of further suffering—injury and/or damages, including but not limited to, the

unauthorized use of his stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of his personal data; lost property in the form of his compromised PII; and injury to his privacy. Additionally, as a direct result of the Data Breach, Plaintiff Patrick now faces a substantial risk that unauthorized third parties will further misuse his PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Patrick has (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm because he lost time he spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

158.    Plaintiff Patrick experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Patrick would compensate him for the foregoing redressable injuries. Further, Plaintiff

Patrick seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of his PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

### 6.  *Plaintiff Margaret Phelan*

159.    Plaintiff Phelan inherited a family member's TIAA account.

160.    Plaintiff Phelan received a letter from PBI dated July 14, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [TIAA]," and experienced the Data Breach, which "may affect the security of some of [Plaintiff Phelan's] information." The letter further states as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.

> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, gender, date of birth, and address.

161.    Thus, the letter states that PBI and TIAA possessed Plaintiff Phelan's sensitive PII, including her name, Social Security number, and additional identifying information, but failed to protect it and, instead, allowed cybercriminals to access it through the data breach.

162.    According to the letter, Progress, PBI, and TIAA learned of the Data Breach as early as May 29-31, 2023, but waited approximately two months before only PBI notified Plaintiff Phelan that her highly sensitive PII was compromised in the Data Breach.

163. In addition to their substantial delay in notifying Plaintiff Phelan of the Data Breach, Defendants also put the burden on Plaintiff Phelan to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."

164. Plaintiff Phelan's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. In or about May 2023, Plaintiff Phelan received a phishing call from an unknown party alleging to be Amazon Security, asserting that people were making fraudulent charges and opening accounts in her name. Because of the phone calls, Plaintiff Phelan made three to four wire transfers, using BitCoin (CoinBase), for a total of approximately $215,000.00, through Chase Bank. As a direct and proximate result of the Data Breach, Plaintiff Phelan spent approximately thirty hours investigating those fraudulent charges, contacting the FBI, Hoboken Police Department, and the FTC to file a report about the phishing call, researching the Data Breach, and monitoring her accounts and credit for suspicious activity.

165. Plaintiff Phelan greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Phelan is very careful about sharing her PII and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Phelan stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be used to compromise her identity and/or credit. Moreover, Plaintiff Phelan diligently chooses unique usernames and passwords for her various online accounts, and takes steps to ensure her online accounts are secure and password-protected.

166.     Plaintiff Phelan is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Phelan to suffer fear, anxiety, and stress, which has been compounded by Defendants' delay in informing her of the fact that her PII, including her Social Security number, was acquired by known cybercriminals through the Data Breach.

167.     Plaintiff Phelan anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Phelan will continue to be at present and continued increased risk of identity theft and fraud for years to come.

168.     Plaintiff Phelan has a continuing interest in ensuring that her PII, which remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

169.     As a result of the Data Breach, Plaintiff Phelan has already suffered—and is at an increased risk of further suffering—injury and/or damages, including but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; over $200,000.00 lost as a result of fraudulent calls demanding payments; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Phelan now faces a substantial risk that unauthorized third parties will further misuse ger PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized

conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Phelan has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

170.    Plaintiff Phelan experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Phelan would compensate her for the foregoing redressable injuries. Further, Plaintiff Phelan seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of her PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

### 7.  *Plaintiff Victor Robert*

171.    Plaintiff Robert holds a life-insurance policy from GLIC.

172.    Plaintiff Robert received a letter directly from GLIC dated July 31, 2023, which reported that "Genworth was recently notified by [PBI] that your personal information was

involved in a data security even that took advantage of a vulnerability in the widely-used MOVEit file transfer software that PBI uses."

173.    Ten days prior, Plaintiff Robert received a letter from PBI dated July 21, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [GLIC], or for a third party acting on their behalf." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded your data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.

> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, date of birth, zip code, state of residence, role in policy/account (eg., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number.

174.    In order to obtain a life-insurance policy from GLIC, Plaintiff Robert was required to provide his PII, directly or indirectly, to Genworth, including his name, date of birth, Social Security number, and other PII.

175.    Thus, the letter states that PBI and Genworth possessed Plaintiff Robert's sensitive PII, including his name and Social Security number, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

176.    According to the letter, Progress, PBI, and Genworth learned of the Data Breach as early as May 29-May 31, 2023, but waited approximately two months before notifying Plaintiff Robert that his highly sensitive PII was compromised in the Data Breach.

177.    In addition to their substantial delay in notifying Plaintiff Robert of the Data Breach, Defendant PBI also put the burden on Plaintiff Robert to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors . . . and to report suspected identity theft incidents to the institution."

178.    Plaintiff Robert greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Robert is very careful about sharing his PII and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Robert stores any and all documents containing PII in a secure location and destroys any documents he receives in the mail that contain any PII or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff Robert diligently chooses unique usernames and passwords for his various online accounts, and he takes steps to ensure his online accounts are secure and password-protected.

179.    Plaintiff Robert is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Robert to suffer fear, anxiety, and stress, which has been compounded by Defendants' several month delay in informing him of the fact that his PII, including his Social Security number, was acquired by known cybercriminals through the Data Breach.

180.    Plaintiff Robert anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Robert will continue to be at present and continued increased risk of identity theft and fraud for years to come.

181.    Plaintiff Robert has a continuing interest in ensuring that his PII, which remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

182.    As a result of the Data Breach, Plaintiff Robert has already suffered—and is at an increased risk of further suffering—injury and/or damages, including but not limited to, the unauthorized use of his stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of his personal data; lost property in the form of his compromised PII; and injury to his privacy. Additionally, as a direct result of the Data Breach, Plaintiff Robert now faces a substantial risk that unauthorized third parties will further misuse his PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Robert has (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm because he lost time he spent taking protective measures that would have otherwise been put to

other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

183.    Plaintiff Robert experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Robert would compensate him for the foregoing redressable injuries. Further, Plaintiff Robert seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of his PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

### 8.  *Plaintiff Susan Romine*

184.    Plaintiff Romine is a former claimant with The Hartford.

185.    Plaintiff Romine received a letter from PBI dated August 4, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including The Hartford," and experienced the Data Breach, which "may affect the security of some of [Plaintiff Romine's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: first and last name with at least one of either Social Security number or date of birth.

186.     Thus, the letter states that PBI and The Hartford possessed Plaintiff Romine's sensitive PII, including her name and/or Social Security number or date of birth, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

187.     According to the letter, Progress, PBI, and The Hartford learned of the Data Breach as early as May 29-31, 2023, but waited over two months before only PBI notified Plaintiff Romine that her highly sensitive PII was compromised in the Data Breach.

188.     In addition to their substantial delay in notifying Plaintiff Romine of the Data Breach, Defendants put the burden on Plaintiff Romine to prevent any further harm resulting from the Data Breach by stating in the letter from PBI: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."

189.     Plaintiff Romine's PII compromised in the Data Breach has already been misused by cybercriminals for fraudulent purposes. Plaintiff Romine has experienced a significant increase in the number of received spam and phishing emails since May 2023. As a direct and proximate result of the Data Breach, Plaintiff Romine spent approximately twenty hours researching the breach and monitoring her accounts for suspicious activity.

190.     Plaintiff Romine greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Romine is very careful about sharing her PII and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Romine stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be used to compromise her identity and/or credit. Moreover, Plaintiff Romine

diligently chooses unique usernames and passwords for her various online accounts, and she takes steps to ensure her online accounts are secure and password-protected.

191.    Plaintiff Romine is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Romine to suffer fear, anxiety, and stress, which has been compounded by Defendants' several-month delay in informing her of the fact that her PII, including her Social Security number, was acquired by known cybercriminals through the Data Breach.

192.    Plaintiff Romine anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Romine will continue to be at present and continued increased risk of identity theft and fraud for years to come.

193.    Plaintiff Romine has a continuing interest in ensuring that her PII, which remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

194.    As a result of the Data Breach, Plaintiff Romine has suffered—or is at an increased risk of suffering—injury and/or damages, including but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Romine now faces a substantial risk that unauthorized third parties will further misuse ger PII because (1) the Data Breach involved cybercriminals specifically targeting

Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Romine has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

195.    Plaintiff Romine experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Romine would compensate her for the foregoing redressable injuries. Further, Plaintiff Romine seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of her PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

### 9. *Plaintiff Anna Sangl*

196.    Plaintiff Sangl holds an account with TIAA.

197.    Plaintiff Sangl received a letter from PBI dated July 14, 2023, which states that PBI

"provides audit and address research services for insurance companies, pension funds, and other

organizations, including [TIAA]," which "may affect the security of some of [Plaintiff Sangl's]

information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of
> MOVEit Transfer software disclosed a vulnerability in their software that had been
> exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course
> of our business operations to securely transfer files. PBI promptly launched an
> investigation into the nature and scope of the MOVEit vulnerability's impact on
> our systems. Through the investigation, we learned that the third party accessed one
> of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and
> downloaded data. We then conducted a manual review of our records to confirm
> the identities of individuals potentially affected by this event and their contact
> information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the
> following types of information related to you were present in the server at the time
> of the event: name, Social Security number, gender, date of birth, and address.

198.    Thus, the letter states that PBI and TIAA possessed Plaintiff Sangl's sensitive PII,

including her name and Social Security number, but failed to protect it and, instead, allowed

cybercriminals to access it through the Data Breach.

199.    According to the letter, Progress, PBI, and TIAA learned of the Data Breach as

early as May 29-31, 2023, but waited approximately two months before PBI notified Plaintiff

Sangl that her highly sensitive PII was compromised in the Data Breach.

200.    In addition to their substantial delay in notifying Plaintiff Sangl of the Data Breach,

Defendants also put the burden on Plaintiff Sangl to prevent any further harm resulting from the

Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud

by reviewing your account statements and monitoring your free credit reports for suspicious

activity and to detect errors."

201.    Plaintiff Sangl's PII compromised in the Data Breach has already been misused by cybercriminals for fraud. Since the Data Breach, Plaintiff Sangl has noticed a marked increase in spam and phishing calls, emails or texts. As a direct and proximate result of the Data Breach, Plaintiff Sangl spent over eight hours monitoring her accounts and credit for suspicious activity.

202.    Plaintiff Sangl greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Sangl is very careful about sharing her PII and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Sangl stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be used to compromise her identity and/or credit. Moreover, Plaintiff Sangl diligently chooses unique usernames and passwords for her various online accounts, and takes steps to ensure her online accounts are secure and password-protected.

203.    Plaintiff Sangl is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Sangl to suffer fear, anxiety, and stress, which has been compounded by Defendants' several-month delay in informing her of the fact that her PII, including her Social Security number, was acquired by known cybercriminals through the Data Breach.

204.    Plaintiff Sangl anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Sangl will continue to be at present and continued increased risk of identity theft and fraud for years to come.

205.    Plaintiff Sangl has a continuing interest in ensuring that her PII, which  remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

206.    As a result of the Data Breach, Plaintiff Sangl has suffered—or is at an increased risk of suffering—injury and/or damages, including but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Sangl now faces a substantial risk that unauthorized third parties will further misuse her PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Sangl has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

207.     Plaintiff Sangl experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Sangl would compensate her for the foregoing redressable injuries. Further, Plaintiff Sangl seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of her PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**10.** *Plaintiff Kenneth White*

208.     Plaintiff White received a letter from PBI dated July 25, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations," and notes that it "processes information about [Plaintiff White] as part of performing legally required services for your life insurer or for a company acting on your life insurer's behalf." The letter also states that it experienced the Data Breach, which "may affect the security of some of [Plaintiff White's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name and Social Security number.

209.     Therefore, the letter states that PBI and another unknown organization possessed Plaintiff White's sensitive PII, including his name and Social Security number, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

210.     According to the letter, Progress and PBI learned of the Data Breach as early as May 29-31, but waited nearly two months before only PBI notified Plaintiff White that his highly sensitive PII was compromised in the Data Breach.

211.     In addition to their substantial delay in notifying Plaintiff White of the Data Breach, Defendants also put the burden on Plaintiff White to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors . . . and to report suspected identity theft incidents to the institution." Notably, Plaintiff White does not even know which institution, beyond PBI, compromised his sensitive PII.

212.     Plaintiff White's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. Several fraudulent charges, each approximately $50.00, were made on Plaintiff White's credit card issued by Capital One. Moreover, Plaintiff White received a notification reporting that his PII was detected on the Dark Web. As a direct and proximate result of the Data Breach, Plaintiff White spent over fifteen hours investigating those fraudulent charges, contacting Capital One to dispute the chargers and ultimately close the Capital One account, researching the breach; contacting major credit bureaus to freeze credit; signing up for Discover credit monitoring, and monitoring accounts for suspicious activity.

213.     Plaintiff White greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff White is very careful about sharing his PII and has

never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff White stores any and all documents containing PII in a secure location and destroys any documents he receives in the mail that contain any PII or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff White diligently chooses unique usernames and passwords for his various online accounts, and he takes steps to ensure his online accounts are secure and password protected.

214.    Plaintiff White is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff White to suffer fear, anxiety, and stress, which has been compounded by Defendants' delay in informing him of the fact that his PII, including his Social Security number, was acquired by known cybercriminals through the Data Breach, without ever stating which company shared that information with PBI.

215.    Plaintiff White anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff White will continue to be at present and continued increased risk of identity theft and fraud for years to come.

216.    Plaintiff White has a continuing interest in ensuring that his PII, which remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

217.    As a result of the Data Breach, Plaintiff White has already suffered—and is at an increased risk of further suffering—injury and/or damages, including but not limited to, the unauthorized use of his stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and

expenses spent monitoring bank accounts for fraudulent activity; loss in value of his personal data; lost property in the form of his compromised PII; and injury to his privacy. Additionally, as a direct result of the Data Breach, Plaintiff White now faces a substantial risk that unauthorized third parties will further misuse his PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff White has (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm because he lost time he spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

218.    Plaintiff White experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff White would compensate him for the foregoing redressable injuries. Further, Plaintiff White seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of his PII

accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**11.** *Plaintiff Charles Williams*

219.    Plaintiff Williams is the beneficiary of a CalPERS retirement plan.

220.    Plaintiff Williams received a letter from CalPERS dated June 22, 2023, informing him of a "cybersecurity breach at [CalPERS]s] third-party provider, [PBI] involving the MOVEit Transfer application . . . . CalPERS uses PBI's services to ensure accuracy in its payments to retirees and beneficiaries." The letter further states as follows:

**What happened?**

PBI provides services to CalPERS to identify member deaths. This ensures that proper payments are made to retirees and beneficiaries and prevents instances of overpayments or other errors.

CalPERS provided data to PBI in a secure, encrypted format. On June 6, 2023, PBI notified CalPERS that a previously unknown "zero-day" vulnerability in the MOVEit transfer application allowed our data to be downloaded by an unauthorized third party.

**What personal information was involved?**

Your personal information that was downloaded included: full name, date of birth and Social Security number.

221.    Thus, the letter states that PBI and CalPERS possessed Plaintiff Williams' sensitive PII, including his name and Social Security number, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

222.    As a direct and proximate result of the Data Breach, Plaintiff Williams spent significant time researching the Data Breach, contacting the major credit bureaus to freeze his credit, and monitoring his accounts and credit for suspicious activity.

223.    Plaintiff Williams greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Williams is very careful about sharing his PII and

has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Williams stores any and all documents containing PII in a secure location and destroys any documents he receives in the mail that contain any PII or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff Williams diligently chooses unique usernames and passwords for his various online accounts, and takes steps to ensure his online accounts are secure and password-protected.

224.     Plaintiff Williams is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Williams to suffer fear, anxiety, and stress, which has been compounded by Defendants' delay in informing him of the fact that his PII, including his Social Security number, was acquired by known cybercriminals through the Data Breach.

225.     Plaintiff Williams anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Williams will continue to be at present and continued increased risk of identity theft and fraud for years to come.

226.     Plaintiff Williams has a continuing interest in ensuring that his PII, which remains in Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

227.     As a result of the Data Breach, Plaintiff Williams has already suffered—and is at an increased risk of further suffering—injury and/or damages, including but not limited to, the unauthorized use of his stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and

expenses spent monitoring bank accounts for fraudulent activity; loss in value of his personal data; lost property in the form of his compromised PII; and injury to his privacy. Additionally, as a direct result of the Data Breach, Plaintiff Williams now faces a substantial risk that unauthorized third parties will further misuse his PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Williams has (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm because he lost time he spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

228.    Plaintiff Williams experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Williams would compensate him for the foregoing redressable injuries. Further, Plaintiff Williams seeks injunctive relief to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of

his PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**E.     Damages Sustained by Plaintiffs and the Other Class Members**

229.     Plaintiffs and all other class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—a risk that justifies expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Personal Information; (iii) breach of the confidentiality of their Personal Information; (iv) deprivation of the value of their Personal Information, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

## CLASS ALLEGATIONS

230.     Plaintiffs bring this action on behalf of themselves and the following classes:

(1) <u>PSC Nationwide Class</u>: All persons whose Personal Information was compromised in the MOVEit data breach.

(a) <u>PSC Illinois Class</u>: All residents of Illinois whose Personal Information was compromised in the MOVEit data breach.

(b) <u>PSC Massachusetts Class</u>: All residents of Massachusetts whose Personal Information was compromised in the MOVEit data breach.

(c) <u>PSC Michigan Class</u>: All residents of Michigan whose Personal Information was compromised in the MOVEit data breach.

(d) <u>PSC New Jersey Class</u>: All residents of New Jersey whose Personal Information was compromised in the MOVEit data breach.

(e) <u>PSC North Carolina Class</u>: All residents of North Carolina whose Personal Information was compromised in the MOVEit data breach.

(f) <u>PSC Ohio Class</u>: All residents of Ohio whose Personal Information was compromised in the MOVEit data breach.

(g) <u>PSC Pennsylvania Class</u>: All residents of Pennsylvania whose Personal Information was compromised in the MOVEit data breach.

(h) <u>PSC Texas Class</u>: All residents of Texas whose Personal Information was compromised in the MOVEit data breach.

The foregoing state-specific PSC classes are collectively referred to as the "PSC State Classes."

(2) <u>PBI Nationwide Class</u>: All persons whose Personal Information was compromised on PBI's platform and/or systems in the MOVEit data breach.

(a) <u>PBI Illinois Class</u>: All residents of Illinois whose Personal Information was compromised on PBI's platform and/or systems in the MOVEit data breach.

(b) <u>PBI Massachusetts Class</u>: All residents of Massachusetts whose Personal Information was compromised on PBI's platform and/or systems in the MOVEit data breach.

(c) <u>PBI Michigan Class</u>: All residents of Michigan whose Personal Information was compromised on PBI's platform and/or systems in the MOVEit data breach.

(d) <u>PBI New Jersey Class</u>: All residents of New Jersey whose Personal Information was compromised on PBI's platform and/or systems in the MOVEit data breach.

(e) <u>PBI North Carolina Class</u>: All residents of North Carolina whose Personal Information was compromised on PBI's platform and/or systems in the MOVEit data breach.

(f) <u>PBI Ohio Class</u>: All residents of Ohio whose Personal Information was compromised on PBI's platform and/or systems in the MOVEit data breach.

(g) <u>PBI Pennsylvania Class</u>: All residents of Pennsylvania whose Personal Information was compromised on PBI's platform and/or systems in the MOVEit data breach.

(h) <u>PBI Texas Class</u>: All residents of Texas whose Personal Information was compromised on PBI's platform and/or systems in the MOVEit data breach.

The foregoing state-specific PBI classes are collectively referred to as the "PBI State Classes."

(3) <u>Genworth Nationwide Class</u>: All persons whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by Genworth.

(a) <u>Genworth Michigan Class</u>: All residents of Michigan whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by Genworth.

(b) <u>Genworth Texas Class</u>: All residents of Texas whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by Genworth.

The foregoing state-specific Genworth classes are collectively referred to as the "Genworth State Classes."

(4) <u>TIAA Nationwide Class</u>: All persons whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by TIAA.

(a) <u>TIAA New Jersey Class</u>: All residents of New Jersey whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by TIAA.

(b) <u>TIAA Pennsylvania Class</u>: All residents of Pennsylvania whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by TIAA.

The foregoing state-specific TIAA classes are collectively referred to as the "TIAA State Classes."

(5) <u>AETNA Nationwide Class</u>: All persons whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by AETNA.

(a) <u>AETNA Michigan Class</u>: All residents of Michigan whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by AETNA.

(6) <u>Corebridge Nationwide Class</u>: All persons whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by Corebridge.

(a) <u>Corebridge New Jersey Class</u>: All residents of New Jersey whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by Corebridge.

(7) <u>DRMS Nationwide Class</u>: All persons whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by DRMS.

(a) <u>DRMS Ohio Class</u>: All residents of Ohio whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by DRMS.

(8) <u>Hartford Nationwide Class</u>: All persons whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by the Hartford.

(a) <u>Hartford Massachusetts Class</u>: All residents of Massachusetts whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by the Hartford.

(9) <u>ReliaStar Nationwide Class</u>: All persons whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by ReliaStar.

(a) <u>ReliaStar Ohio Class</u>: All residents of Ohio whose Personal Information was compromised in the MOVEit data breach where such Personal Information was obtained from or hosted by ReliaStar.

The PSC, PBI, Genworth, TIAA, Hartford, Aetna, Corebridge, DRMS, and ReliaStar Nationwide Classes are collectively referred to as the "Nationwide Classes." All of the foregoing classes are referred to herein, collectively, as the "Class." Excluded from the Class are: (1) the judges presiding over the action, Class Counsel, and members of their families; (2) the Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former officers and directors; (3) persons who properly opt out; and (4) the successors or assigns of any such excluded persons.

231. **Numerosity**: Class members are so numerous that their individual joinder is impracticable, as the proposed Class includes at least 60 million members who are geographically dispersed.

232. **Typicality**: Plaintiffs' claims are typical of class members' claims. Plaintiffs and all class members were injured through Defendants' uniform misconduct, and Plaintiffs' claims are identical to the claims of the class members they seek to represent.

233. **Adequacy**: Plaintiffs' interests are aligned with the Class they seek to represent, and Plaintiff has retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiffs and their counsel intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiffs and undersigned counsel.

234. **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiffs' and other class members' claims. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for class members individually to effectively redress Defendants' wrongdoing. Even if class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

235. **Commonality and Predominance:** The following questions common to all class members predominate over any potential questions affecting individual class members:

  a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and class members' Personal Information from unauthorized access and disclosure;

  b. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and class members' Personal Information;

c.   Whether Defendants breached their duties to protect Plaintiffs' and class members' Personal Information;

d.   Whether Defendants violated the statutes alleged herein;

e.   Whether Plaintiffs and all other class members are entitled to damages and the measure of such damages and relief.

236.   Given that Defendants engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and common law violations are involved, and common questions outweigh any potential individual questions.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

237.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

238.   All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Bickell, Hernandez, and Robert, bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiffs Phelan and Sangl bring this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA state-specific Classes. Plaintiff Mendez brings this claim against Corebridge on behalf of the Corebridge Nationwide Class or, in the alternative, the Corebridge New Jersey Class. Plaintiff Baade brings this claim against Aetna on behalf of the Aetna Nationwide Class or, in the alternative, the Aetna Michigan Class. Plaintiff Romine brings this claim against the Hartford on behalf of the Hartford Nationwide class or, in the alternative, the Hartford Massachusetts Class. Plaintiff Patrick brings this claim against DRMS on behalf of the DRMS

Nationwide Class or, in the alternative, the DRMS Ohio Class. Plaintiff Patrick brings this claim against ReliaStar on behalf of the ReliaStar Nationwide Class or, in the alternative, the ReliaStar Ohio Class.

239.    Defendants owed duties to Plaintiffs and all other class members to exercise reasonable care in safeguarding and protecting their Personal Information in Defendants' possession, custody, or control.

240.    Defendants knew the risks of collecting and storing Plaintiffs' and all other class members' Personal Information and the importance of maintaining secure systems. Defendants knew of the many data breaches that targeted healthcare providers in recent years.

241.    Given the nature of Defendants' businesses, the sensitivity and value of the Personal Information it maintains, and the resources at its disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

242.    Defendants breached their duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Personal Information entrusted to them—including Plaintiffs' and class members' Personal Information.

243.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and class

members' Personal Information to unauthorized individuals.

244.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiffs and class members, their Personal Information would not have been compromised.

245.    As a result of Defendants' above-described wrongful actions, inactions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and all other class members have suffered, and will continue to suffer, economic damages and other injuries and actual harm in the form of, inter alia: (i) a substantially increased risk of identity theft and medical theft—a risk that justifies expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Personal Information; (iii) breach of the confidentiality of their Personal Information; (iv) deprivation of the value of their Personal Information, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

### COUNT II
### NEGLIGENCE PER SE

246.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

247.    All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Bickell, Hernandez, and Robert, bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiffs Phelan and Sangl bring this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA state-specific Classes. Plaintiff Mendez brings this claim against Corebridge

on behalf of the Corebridge Nationwide Class or, in the alternative, the Corebridge New Jersey Class. Plaintiff Baade brings this claim against Aetna on behalf of the Aetna Nationwide Class or, in the alternative, the Aetna Michigan Class. Plaintiff Romine brings this claim against the Hartford on behalf of the Hartford Nationwide class or, in the alternative, the Hartford Massachusetts Class. Plaintiff Patrick brings this claim against DRMS on behalf of the DRMS Nationwide Class or, in the alternative, the DRMS Ohio Class. Plaintiff Patrick brings this claim against ReliaStar on behalf of the ReliaStar Nationwide Class or, in the alternative, the ReliaStar Ohio Class.

248.    Defendants' duties arise from, inter alia, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

249.    Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable measures to protect and secure Personal Information.

250.    Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and all other class members' Personal Information and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Personal Information they obtain and store, and the foreseeable consequences of a data breach involving Personal Information including, specifically, the substantial damages that would result to Plaintiffs and the other class members.

251.     Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

252.     Plaintiffs and class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

253.     The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

254.     It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and class members' Personal Information to unauthorized individuals.

255.     The injury and harm that Plaintiffs and the other class members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiffs and class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia: (i) a substantially increased risk of identity theft and medical theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Personal Information; (iii) breach of the confidentiality of their Personal Information; (iv) deprivation of the value of their Personal Information, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

<u>**COUNT III**</u>
**INVASION OF PRIVACY (INTRUSION UPON SECLUSION)**

256.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

257.    All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Bickell, Hernandez, and Robert, bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiffs Phelan and Sangl bring this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA state-specific Classes. Plaintiff Mendez brings this claim against Corebridge on behalf of the Corebridge Nationwide Class or, in the alternative, the Corebridge New Jersey Class. Plaintiff Baade brings this claim against Aetna on behalf of the Aetna Nationwide Class or, in the alternative, the Aetna Michigan Class. Plaintiff Romine brings this claim against the Hartford on behalf of the Hartford Nationwide class or, in the alternative, the Hartford Massachusetts Class. Plaintiff Patrick brings this claim against DRMS on behalf of the DRMS Nationwide Class or, in the alternative, the DRMS Ohio Class. Plaintiff Patrick brings this claim against ReliaStar on behalf of the ReliaStar Nationwide Class or, in the alternative, the ReliaStar Ohio Class.

258.    Plaintiffs and class members had a reasonable expectation of privacy in the Personal Information that Defendants failed to safeguard and allowed to be accessed by way of the Data Breach.

259.    Defendants' conduct as alleged above intruded upon Plaintiffs' and class members' seclusion under common law.

260.    By intentionally and/or knowingly failing to keep Plaintiffs' and class members' Personal Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendants intentionally invaded Plaintiffs' and class members' privacy by:

   a.   Intentionally and substantially intruding into Plaintiffs' and class members' private affairs in a manner that identifies Plaintiffs and class members and that would be highly offensive and objectionable to an ordinary person;

   b.   Intentionally publicizing private facts about Plaintiffs and class members, which is highly offensive and objectionable to an ordinary person; and

   c.   Intentionally causing anguish or suffering to Plaintiffs and class members.

261.    Defendants knew that an ordinary person in Plaintiffs' and a Class members' positions would consider Defendants' intentional actions highly offensive and objectionable.

262.    Defendants invaded Plaintiffs' and class members' right to privacy and intruded into Plaintiffs' and class members' seclusion by intentionally failing to safeguard, misusing, and/or disclosing their Personal Information without their informed, voluntary, affirmative, and clear consent.

263.    Defendants intentionally concealed from Plaintiffs and class members an incident that misused and/or disclosed their Personal Information without their informed, voluntary, affirmative, and clear consent.

264.    As a proximate result of such intentional misuse and disclosures, Plaintiffs' and Class members' reasonable expectations of privacy in their Personal Information was unduly frustrated and thwarted. Defendants' conduct, amounting to a substantial and serious invasion of Plaintiff's and class members' protected privacy interests causing anguish and suffering such that

an ordinary person would consider Defendants' intentional actions or inaction highly offensive and objectionable.

265.    In failing to protect Plaintiffs' and class members' Personal Information, and in intentionally misusing and/or disclosing their Personal Information, Defendants acted with intentional malice and oppression and in conscious disregard of Plaintiffs' and class members' rights to have such information kept confidential and private.

266.    As a direct and proximate result of the foregoing conduct, Plaintiffs seek an award of damages on behalf of themselves and the Class.

**COUNT IV**
**INVASION OF PRIVACY (PUBLIC DISCLOSURE OF PRIVATE FACTS)**

267.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

268.    All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Bickell, Hernandez, and Robert, bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiffs Phelan and Sangl bring this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA state-specific Classes. Plaintiff Mendez brings this claim against Corebridge on behalf of the Corebridge Nationwide Class or, in the alternative, the Corebridge New Jersey Class. Plaintiff Baade brings this claim against Aetna on behalf of the Aetna Nationwide Class or, in the alternative, the Aetna Michigan Class. Plaintiff Romine brings this claim against the Hartford on behalf of the Hartford Nationwide class or, in the alternative, the Hartford Massachusetts Class. Plaintiff Patrick brings this claim against DRMS on behalf of the DRMS Nationwide Class or, in the alternative, the DRMS Ohio Class. Plaintiff Patrick brings this claim

against ReliaStar on behalf of the ReliaStar Nationwide Class or, in the alternative, the ReliaStar Ohio Class.

269.    Plaintiffs and Class members had a reasonable expectation of privacy in the Personal Information that they provided to Defendants, directly or indirectly, in exchange for Defendants' services, which Defendants mishandled and allowed to be comprised in the Data Breach.

270.    As a result of Defendants' conduct, publicity was given to Plaintiffs' and Class members' Personal Information, which necessarily includes matters concerning their private life.

271.    A reasonable person of ordinary sensibilities would consider the publication of Plaintiffs' and Class members' Personal Information to be highly offensive.

272.    Plaintiffs' and Class members' Personal Information is not of legitimate public concern and should remain private.

273.    As a direct and proximate result of Defendants' public disclosure of private facts, Plaintiffs and Class members are at a current and ongoing risk of identity theft and sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their Personal Information; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their Personal Information, which remains in Defendants' possession, and which is subject to further breaches,

so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class members' Personal Information.

274.    Plaintiffs and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

275.    Plaintiffs and Class members are also entitled to injunctive relief requiring Defendants to, inter alia: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

### COUNT V
### BREACH OF IMPLIED CONTRACT

276.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

277.    All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Bickell, Hernandez, and Robert, bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiffs Phelan and Sangl bring this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA state-specific Classes. Plaintiff Mendez brings this claim against Corebridge on behalf of the Corebridge Nationwide Class or, in the alternative, the Corebridge New Jersey Class. Plaintiff Baade brings this claim against Aetna on behalf of the Aetna Nationwide Class or, in the alternative, the Aetna Michigan Class. Plaintiff Romine brings this claim against the Hartford on behalf of the Hartford Nationwide class or, in the alternative, the Hartford Massachusetts Class. Plaintiff Patrick brings this claim against DRMS on behalf of the DRMS Nationwide Class or, in the alternative, the DRMS Ohio Class. Plaintiff Patrick brings this claim

against ReliaStar on behalf of the ReliaStar Nationwide Class or, in the alternative, the ReliaStar Ohio Class.

278.    Defendants required Plaintiffs and Class members to entrust them with their Personal Information, directly or indirectly, in connection with Defendants' provision of services to Plaintiffs and Class members.

279.    In turn, and through internal policies set forth herein, Defendants agreed to safeguard and not disclose to unauthorized persons the Personal Information they collected from Plaintiffs and Class members.

280.    Plaintiffs and the Class members accepted Defendants' offers by providing Personal Information to them in exchange for Defendants' services.

281.    Implicit in the parties' agreement was that Defendants would adequately safeguard the Personal Information entrusted to them and would provide Plaintiffs and Class members with prompt and adequate notice of all unauthorized access and/or theft of their Personal Information.

282.    Plaintiffs and the Class members would not have entrusted their Personal Information to Defendants in the absence of such an agreement.

283.    Defendants materially breached the contract(s) they had entered into with Plaintiffs and Class members by failing to safeguard such Personal Information and failing to notify them promptly of the intrusion into their computer systems that compromised such information. Defendants further breached the implied contracts with Plaintiffs and Class members by:

> A.    Failing to properly safeguard and protect Plaintiffs and Class members' Personal Information;
>
> B.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and
>
> C.    Failing to ensure the confidentiality and integrity of electronic Personal Information that Defendants created, received, maintained, and transmitted.

284.   The damages sustained by Plaintiffs and Class members as described above were the direct and proximate result of Defendants' material breaches of their implied agreement(s).

285.   Plaintiffs and Class members have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendants.

286.   The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

287.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

288.   Defendants knew or should have known that Plaintiffs and Class members reasonably understood that Defendants would safeguard the Personal Information Defendants required Plaintiffs and Class members to disclose in order to provide Defendants' services to them. Despite Plaintiffs' and Class members' reasonable expectations, Defendants failed to implement appropriate cybersecurity protocols to protect the Personal Information on their systems from the Data Breach.

289.   In addition, Defendants failed to advise Plaintiffs and Class members of the Data Breach promptly and sufficiently. Defendants' own website and other statements promised Plaintiffs and other Class members that they would keep their Personal Information safe and

promptly notify them of any Data Breaches. Defendants, however, failed to do so, having waited multiple months before notifying Plaintiffs of the Data Breach.

290.    In these and other ways, Defendants violated its duties of good faith and fair dealing.

291.    Plaintiffs and Class members have sustained injury and damages because of Defendants' breaches of their agreements, including breaches thereof through violations of the covenant of good faith and fair dealing, including, without limitation: unauthorized disclosure of their Personal Information and publication onto the Dark Web; monetary losses; lost time; anxiety, and emotional distress; loss of the opportunity to control how their Personal Information is used; diminution in value of their Private Information; compromise and continuing publication of their Personal Information; Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; delay in receipt of tax refund monies; unauthorized use of stolen Personal Information; continued risk to their Personal Information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Personal Information in their possession; increased risk of harm; and lost benefit of the bargain.

## COUNT VI
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT

292.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

293.    All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI

Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. Plaintiff Patrick brings this claim against DRMS on behalf of the DRMS Nationwide Class or, in the alternative, the DRMS Ohio Class.

294.    PBI entered into contracts with its government and corporate customers to provide services to them using MOVEit; services that included data security practices, procedures, and protocols sufficient to safeguard the Personal Information that was entrusted to Defendants.

295.    Such contracts were made expressly for the benefit of Plaintiffs and the Class members, as it was their Personal Information that Defendants agreed to receive, store, utilize, transfer, and protect through their services. Thus, the benefit of collection and protection of the Personal Information belonging to Plaintiffs and the Class members was the direct and primary objective of the contracting parties and Plaintiffs and Class members were direct and express beneficiaries of such contracts.

296.    Defendants knew or should have known that if they were to breach these contracts, Plaintiffs and Class members would be harmed.

297.    Defendants breached their contracts by, among other things, failing to adequately secure Plaintiffs' and Class members' Personal Information, and, as a result, Plaintiffs and Class members were harmed by Defendants' failure to secure their Personal Information.

298.    As a direct and proximate result of Defendants' breach, Plaintiffs and Class members are at a current and ongoing risk of identity theft, and Plaintiffs and Class members sustained incidental and consequential damages including: (i) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (ii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iii) financial "out of pocket" costs incurred due to actual identity theft; (iv) loss of time

incurred due to actual identity theft; (v) loss of time due to increased spam and targeted marketing emails; (vi) diminution of value of their Personal Information; (vii) future costs of identity theft monitoring; (viii) and the continued risk to their Personal Information, which remains in Defendants' control, and which is subject to further breaches, so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiff's and Class members' Personal Information.

299.    Plaintiffs and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

300.    Plaintiffs and Class members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

**COUNT VII**
**UNJUST ENRICHMENT**

301.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

302.    All Plaintiffs bring this claim against PSC and PBI on behalf of the PSC and PBI Nationwide Classes or, in the alternative, the PSC State Classes and PBI State Classes. In addition, Plaintiffs Bickell, Hernandez, and Robert, bring this claim against Genworth on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiffs Phelan and Sangl bring this claim against TIAA on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA state-specific Classes. Plaintiff Mendez brings this claim against Corebridge on behalf of the Corebridge Nationwide Class or, in the alternative, the Corebridge New Jersey Class. Plaintiff Baade brings this claim against Aetna on behalf of the Aetna Nationwide Class or,

in the alternative, the Aetna Michigan Class. Plaintiff Romine brings this claim against the Hartford on behalf of the Hartford Nationwide class or, in the alternative, the Hartford Massachusetts Class. Plaintiff Patrick brings this claim against DRMS on behalf of the DRMS Nationwide Class or, in the alternative, the DRMS Ohio Class. Plaintiff Patrick brings this claim against ReliaStar on behalf of the ReliaStar Nationwide Class or, in the alternative, the ReliaStar Ohio Class.

303.    Plaintiffs and Class members have both a legal and equitable interest in their Personal Information that was collected by, stored by, and maintained by Defendants—thus conferring a benefit upon Defendants—that was ultimately compromised by the Data Breach.

304.    Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and class members. Defendants also benefitted from the receipt of Plaintiffs' and class members' Personal Information.

305.    As a result of Defendants' failure to safeguard and protect Personal Information, Plaintiffs and class members suffered actual damages.

306.    Defendants should not be permitted to retain the benefit belonging to Plaintiffs and class members because Defendants failed to adequately implement the data privacy and security procedures that were mandated by federal, state, and local laws and industry standards.

307.    Defendants should be compelled to provide for the benefit of Plaintiffs and class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## COUNT VIII
## VIOLATIONS OF ILLINOIS PERSONAL INFORMATION PROTECTION ACT ("PIPA"), 815 ILCS 530/10(a)

308.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

309.    Plaintiff White brings this claim against PSC on behalf of the PSC Illinois Class and PBI on behalf of the PBI Illinois Class.

310.    Section 10(b) of PIPA states, in pertinent part:

[a]ny data collector that maintains or stores, but does not own or license, computerized data that includes personal information that the data collector does not own or license shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person.

815 ILCS 530/10(b).

311.    Defendants PBI and PSC are "data collector[s]" as defined by the statute because each Defendant is a company that "handles, collects, disseminates, or otherwise deals with nonpublic personal information." 815 ILCS 530/5.

312.    Plaintiff White's and the Illinois Class members' claims are based on their statuses as "owner[s]" of their Personal Information.

313.    Defendants PBI and PSC failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach.

314.    Section 45 of PIPA requires entities who maintain or store "personal information concerning an Illinois resident" to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure."

315.    Defendants PBI's and PSC's conduct violated PIPA because they voluntarily undertook the act of maintaining and storing Plaintiff White's Personal Information, but failed to implement safety and security procedures and practices sufficient enough to protect from the Data Breach that it should have anticipated.

316.    Defendants PBI and PSC should have known and anticipated that data breaches were on the rise and that software companies were lucrative or likely targets of cyber criminals looking to steal Personal Information. Therefore, Defendants PBI and PSC should have implemented and maintained procedures and practices appropriate to the nature and scope of information compromised in the Data Breach.

317.    As a result of Defendants PBI's and PSC's violation of PIPA, Plaintiff and the Illinois Subclass incurred economic damages, including expenses associated with necessary credit monitoring.

## COUNT IX
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1, *ET SEQ.*

318.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

319.    Plaintiff White brings this claim against PSC on behalf of the PSC Illinois Class and PBI on behalf of the PBI Illinois Class.

320.    Section 2 of ICFA prohibits unfair or deceptive acts or practices and states, in relevant part, as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

321.    Defendants PBI and PSC violated Section 2 of ICFA by engaging in unfair acts in the course of conduct involving trade or commerce when dealing with Plaintiff White. Specifically, it was an unfair act and practice for Defendants PBI and PSC to represent to the public that they implemented commercially reasonable measures to protect Plaintiff White's Personal Information

when Defendants PBI and PSC knew or should have known that they failed to fulfill such representations, including by preventing and failing to timely detect the Data Breach.

322.   Despite representing to Plaintiff White and the Illinois Class members that they would implement commercially reasonable measures to protect their Personal Information, Defendants PBI and PSC nonetheless failed to fulfill such representations.

323.   Plaintiff White and the Illinois Class members have suffered injury in fact and actual damages, as alleged herein, as a result of Defendants PBI's and PSC's unlawful conduct and violations of the ICFA and analogous state statutes.

324.   Defendants PBI's and PSC's conduct offends public policy as it demonstrates a practice of unfair and deceptive business practices in failing to safeguard consumers Personal Information.

325.   An award of punitive damages is appropriate because Defendants PBI's and PSC's conduct described above was outrageous, willful and wanton, showed a reckless disregard for the rights of the Plaintiff White and consumers, generally, and Plaintiff White had no choice but to submit to Defendants PBI's and PSC's illegal conduct.

<u>**COUNT X**</u>
**VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT, 815 ILL. COMP. STAT. §§ 510/2, ET SEQ.**

326.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

327.   Plaintiff White brings this claim against PSC on behalf of the PSC Illinois Class and PBI on behalf of the PBI Illinois Class.

328.   Defendants PBI and PSC are both a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

329.     Defendants PBI and PSC engaged in deceptive trade practices in the conduct of their business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including, but not limited to:

      a.  Representing that goods or services have characteristics that they do not have;

      b.  Representing that goods or services are of a particular standard, quality, or grade if they are of another;

      c.  Advertising goods or services with intent not to sell them as advertised; and

      d.  Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

330.     Defendants PBI's and PSC's deceptive acts and practices include:

      a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff White's Private Information, which was a direct and proximate cause of the Data Breach;

      b.  Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

      c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff White's Private Information, which was a direct and proximate cause of the Data Breach;

      d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiff White's Private Information, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff White's Private Information;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff White's Private Information; and

g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff White's Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a).

331.   Defendants PBI's and PSC's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of its data security and ability to protect the confidentiality of consumers' Private Information.

332.   The above unfair and deceptive practices and acts by Defendants PBI and PSC were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff White that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

333.   As a direct and proximate result of Defendants PBI's and PSC's unfair, unlawful, and deceptive trade practices, Plaintiff White has suffered and will continue to suffer injury.

334.   Plaintiff White and the Illinois Class members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees and costs.

<u>**COUNT XI**</u>
**VIOLATION OF MASSACHUSETTS GENERAL LAWS, CHAPTER 93A**

335.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

336.    Plaintiff Romine brings this claim against PSC on behalf of the PSC Nationwide Class and the PSC Massachusetts Class, PBI on behalf of the PBI Nationwide Class and the PBI Massachusetts Class, and the Hartford on behalf of the Hartford Massachusetts Class.

337.    M.G.L. ch. 93A §§ 2 and 9.  M.G.L. ch. 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  M.G.L. ch. 93A § 9 permits any consumer injured by a violation of M.G.L. ch. 93A § 2 to bring a civil action, including a class action, for damages and injunctive relief.

338.    Plaintiff Romine alleges that Defendants PSC, PBI, and The Hartford committed unfair business acts and/or practices in violation of M.G.L. ch. 93A §§ 2 and 9.

339.    Defendants PSC, PBI, and The Hartford knew or should have known of the inherent risks in experiencing a data breach if they failed to maintain adequate systems and processes for keeping Plaintiff Romine's and Class members' Personal Information safe and secure. Only Defendants PSC, PBI, and The Hartford were in a position to ensure that their systems were sufficient to protect against harm to Plaintiff Romine and the Class resulting from a data security incident such as the Data Breach; instead, they failed to implement such safeguards.

340.    Defendants PSC's, PBI's, and The Hartford's own conduct also created a foreseeable risk of harm to Plaintiff Romine and Class members and their Personal Information. Defendants PSC's, PBI's, and the Hartford's misconduct included failing to adopt, implement, and maintain the systems, policies, and procedures necessary to prevent the Data Breach.

341.    Defendants PSC, PBI, and The Hartford acknowledge their conduct created actual harm to Plaintiff Romine and Class members because Defendants instructed them to monitor their accounts for fraudulent conduct and identity theft.

342.    Defendants PSC, PBI, and The Hartford knew, or should have known, of the risks inherent in disclosing, collecting, storing, accessing, and transmitting Personal Information and the importance of adequate security because of, inter alia, the prevalence of data breaches.

343.    Defendants PSC, PBI, and The Hartford failed to adopt, implement, and maintain fair, reasonable, or adequate security measures to safeguard Plaintiff Romine's and Class members' Personal Information, failed to recognize in a timely manner the Data Breach, and failed to notify Plaintiff Romine and Class members in a timely manner that their Personal Information was accessed in the Data Breach.

344.    These acts and practices are unfair in material respects, offend public policy, are immoral, unethical, oppressive and unscrupulous and violate 201 CMR 17.00 and M.G.L. ch. 93A § 2.

345.    As a direct and proximate result of Defendants PSC's, PBI's, and the Hartford's unfair acts and practices, Plaintiff Romine and the Class have suffered injury and/or will suffer injury and damages, including but not limited to: (i) the loss of the opportunity to determine for themselves how their Personal Information is used; (ii) the publication and/or fraudulent use of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of Defendants' Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from unemployment and/or tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Personal Information, which remains in Defendants' possession (and/or to

which Defendants continue to have access) and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Personal Information in their continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of disclosed Personal Information.

346.    Neither Plaintiff Romine, nor the other Class members contributed to Defendants' Data Breach.

347.    Plaintiff Romine sent a demand for relief, in writing, to Defendants on May 28, 2024, prior to filing this complaint. Multiple plaintiffs in consolidated actions have sent[41]—or alleged in their complaints that they would send[42]—similar demand letters as required by M.G.L. ch. 93A § 9.  Plaintiff Romine has not received a written tender of settlement that is reasonable in relation to the injury actually suffered by Plaintiff Romine and the Class.

---

[41] *See, e.g.*, *Ghalem, et al. v. Progress Software Co., et al.*, 23-cv-12300 (D. Mass.), at ECF No. 1, ¶ 213 ("A demand identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered was mailed or delivered to Defendants at least thirty days prior to the filing of a pleading alleging this claim for relief").

[42] In all of the following cases (among others), plaintiffs indicated that they were going to send similar demand letters: *Allen, et al. v. Progress Software Corp*., 23-cv-11984 (D. Mass.); *Anastasio v. Progress Software Corp., et al*., 23-cv-11442 (D. Mass.); *Arden v. Progress Software Corp., et al*., 23-cv-12015 (D. Mass.); *Boaden v. Progress Software Corp., et al*., 23-cv-12192 (D. Mass.); *Brida v. Progress Software Corp., et al*., 23-cv-12202 (D. Mass.); *Casey v. Progress Software Corp., et al*., 23-cv-11864 (D. Mass.); *Constantine v. Progress Software Corp., et al*., 23-cv-12836 (D. Mass.); *Daniels v. Progress Software Corp., et al*., 23-cv-12010 (D. Mass.); *Doe v. Progress Software Corp., et al*., 23-cv-1933 (D. Md.); *Ghalem, et al. v. Progress Software Co., et al*., 23-cv-12300 (D. Mass.); *Kennedy v. Progress Software Corp., et al*., 23-cv-12275 (D. Mass.); *Kurtz v. Progress Software Corp., et al*., 23-cv-12156 (D. Mass.); *McDaniel, et al. v. Progress Software Corp., et al*., 23-cv-11939 (D. Mass.); *Pilotti-Iulo v. Progress Software Corp., et al*., 23-cv-12157 (D. Mass.); *Pulignani v. Progress Software Corp., et al*., 23-cv-1912 (D. Md.); *Siflinger, et al. v. Progress Software Corp., et al*., 23-cv-11782 (D. Mass.); *Tenner v. Progress Software Corp*., 23-cv-11412 (D. Mass.); *Truesdale v. Progress Software Corp., et al*., 23-cv-1913 (D. Md.).

348.     Based on the foregoing, Plaintiff Romine and the other members of the class are entitled to all remedies available pursuant to M.G.L ch. 93A, including, but not limited to, refunds, actual damages, or statutory damages in the amount of twenty-five dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

349.     Pursuant to M.G.L. ch. 231, § 6B, Plaintiff Romine and other members of the Class are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct. The amount of damages suffered as a result is a sum certain and capable of calculation and Plaintiff Romine and other members of the Class are entitled to interest in an amount according to proof.

**COUNT XII**
**VIOLATION OF THE MICHIGAN IDENTITY THEFT PROTECTION ACT,**
**MICH. COMP. LAWS ANN. §§ 445.72, ET SEQ.**

350.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

351.     Plaintiffs Bickell and Robert bring this claim against PSC on behalf of the PSC Michigan Class, PBI on behalf of the PBI Michigan Class, and Genworth on behalf of the Genworth Michigan Class. Plaintiff Baade brings this claim against PSC on behalf of the PSC Michigan Class, PBI on behalf of the PBI Michigan Class, and Aetna on behalf of the Aetna Michigan Class.

352.     Defendants PSC, PBI, Genworth, and Aetna are each a business that owns or licenses computerized data that includes "personal information" as defined by Mich. Comp. Laws § 445.72(1).

353.     Plaintiff Bickell's, Robert's, and Baade's and the proposed Class members' Personal Information includes personal information as defined and covered under Mich. Comp. Laws § 445.72(1).

354.    Defendants PSC, PBI, Genworth, and Aetna were required to accurately notify Plaintiffs Bickell, Robert, and Baade and the Michigan Class if they discovered a security breach, or received notice of a security breach without unreasonable delay. Mich. Comp. Laws § 445.72(1).

355.    Defendants PSC, PBI, Genworth, and Aetna were required to provide notice that was written in a "clear and conspicuous manner." Mich. Comp. Laws § 445.72(6).

356.    Because Defendants PSC, PBI, Genworth, and Aetna discovered a security breach and had notice of a security breach involving the Personal Information of Plaintiffs Bickell, Robert, and Baade and the Michigan Class embers (i.e., the Data Breach), they had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Mich. Comp. Laws § 445.72(4).

357.    By failing to disclose the data breach in a timely and accurate manner and provide notice clearly and conspicuously, Defendants PSC, PBI, Genworth, and Aetna violated Mich. Comp. Laws § 445.72(4).

358.    As a direct and proximate result of Defendants PSC's, PBI's, Genworth's, and Aetna's violations of Mich. Comp. Laws § 445.72(4), Plaintiffs Bickell, Robert, and Baade and the Michigan Class Members suffered damages, as described herein. Plaintiffs Bickell, Robert, and Baade and the Michigan Class seek relief under Mich. Comp. Laws § 445.72(13), including a civil fine.

## COUNT XIII
## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. §§ 56:8-1, ET SEQ. ("NJCFA")

359.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

360.    Plaintiff Phelan brings this claim against PSC on behalf of the PSC New Jersey

Class, PBI on behalf of the PBI New Jersey Class, and TIAA on behalf of the TIAA New Jersey Class. Plaintiff Mendez brings this claim against PSC on behalf of the PSC New Jersey Class, PBI on behalf of the PBI New Jersey Class, and Corebridge on behalf of the Corebridge New Jersey Class.

361.    The NJCFA states:

The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. § 56:8-2.

362.    Plaintiffs Phelan and Mendez, New Jersey Class members, and Defendants PSC, PBI, TIAA, and Corebridge are "persons" under the NJCFA. N.J. Stat. § 56:8-1(d). 233.

363.    The services that Defendants PSC, PBI, TIAA, and Corebridge provided are "merchandise" pursuant to the NJCFA. N.J. Stat. § 56:8-1(c). 234.

364.    Defendants PSC, PBI, TIAA, and Corebridge made uniform representations to Plaintiffs Phelan and Mendez and New Jersey Class members that their Personal Information would remain private, as alleged above. They committed deceptive omissions in violation of the NJCFA by failing to inform Plaintiffs Phelan and Mendez and New Jersey Class members that they would not adequately secure their Personal Information. Documents that should have contained such disclosures, but did not, include the privacy policies referenced in this Complaint and other statements alleged above.

365.    Defendants PSC, PBI, TIAA, and Corebridge separately engaged in unfair acts and practices in violation of the NJCFA by failing to implement and maintain reasonable security

measures to protect and secure Plaintiffs Phelan's and Mendez's and New Jersey Class members' Personal Information in a manner that complied with applicable laws, regulations, and industry standards. The failure to implement and maintain reasonable data security measures offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

366.     Due to the Data Breach, Plaintiffs Phelan and Mendez and New Jersey Class members have lost property in the form of their Personal Information. Further, Defendants PSC's, PBI's, TIAA's, and Corebridge's failure to adopt reasonable practices in protecting and safeguarding their Personal Information will force Plaintiffs Phelan and Mendez and New Jersey Class members to spend time or money to protect against identity theft.

367.     Plaintiffs Phelan and Mendez and New Jersey Class members are now at a substantially higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Defendants PSC's, PBI's, TIAA's, and Corebridge's practice of collecting and storing Personal Information without appropriate and reasonable safeguards to protect such information.

368.     Plaintiffs Phelan and Mendez and New Jersey Class members were damaged by Defendants PSC's, PBI's, TIAA's, and Corebridge's violation of the NJCFA because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their Personal Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Personal Information has been breached; (v) they were deprived of the value of their Personal Information, for which there is a well-established national and international market; (vi) they lost

time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

## COUNT XIV
### VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. §§ 75-1.1, *ET SEQ.* ("NCUDTPA")

369.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

370.    Plaintiff Williams brings this claim against PSC on behalf of the PSC North Carolina Class, and PBI on behalf of the PBI North Carolina Class.

371.    The NCUDTPA prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"

372.    The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. GEN. STAT. § 75-16.

373.    Defendants PBI's and PSC's acts and practices complained of herein were performed in the course of their trade or business and thus occurred in or affected "commerce," as defined in N.C. GEN. STAT. § 75-1.1(b).

374.    Defendants PSC and PBI engaged in deceptive and unfair acts and practices, misrepresentation, and concealment, suppression, and omission of material facts in connection with the sale and advertisement of services in violation of the NCUDTPA. Defendants PBI's and PSC's acts and practices are unfair and/or deceptive in at least the following respects:

- failing to maintain sufficient security to keep Plaintiff Williams' and North Carlina Class members' Personal Information being hacked and stolen;

- misrepresenting material facts to the North Carolina Class, in connection with the sale of services, by representing that they would maintain adequate data privacy and security practices and procedures to safeguard North Carolina Class members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

- misrepresenting material facts to the North Carolina Class, in connection with sale of services, by representing that Defendants did and would (or omitting that it would not) comply with the requirements of relevant federal and state laws pertaining to the privacy and security of North Carolina Class members' Personal Information; and

- failing to take proper action following the data breach to enact adequate privacy and security measures and protect North Carolina Class members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

375.   In addition, Defendants PBI's and PSC's failure to disclose that its computer systems were not well-protected and that Plaintiff Williams' and North Carolina Class members' Personal Information was vulnerable and susceptible to intrusion and cyberattacks constitutes deceptive and/or unfair acts or practices because Defendants PBI and PSC knew such facts would (a) be unknown to and not easily discoverable by Plaintiff Williams and the North Carolina Class; and (b) defeat Plaintiff Williams' and North Carolina Class members' ordinary, foreseeable, and reasonable expectations concerning the security of their Personal Information on Defendants PBI's and PSC's systems.

376.   Defendants PBI and PSC intended that Plaintiff Williams and the North Carolina Class would rely on their deceptive and unfair acts and practices, misrepresentations, and concealment, suppression, and omission of material facts in connection with Defendants PBI's and PSC's offering of services and incorporating Plaintiff Williams' and North Carolina Class members' Personal Information on their systems in violation of the NCUDTPA.

377.   Defendants PBI and PSC also engaged in unfair acts and practices in connection with the sale of services by failing to maintain the privacy and security of North Carolina Class members' Personal Information in violation of duties imposed by and public policies reflected in

applicable federal and state laws resulting in the Data Breach. These unfair acts and practices violated duties imposed by laws including the FTC Act (15 U.S.C. § 45) and similar state laws.

378.    Defendants PBI's and PSC's acts and practices are contrary to North Carolina law and policy and constitute immoral, unethical, oppressive, and unscrupulous business practices that caused substantial injury to Plaintiff Williams and North Carolina Class members. The gravity of the harm resulting from Defendants PBI's and PSC's unfair conduct outweighs any potential utility of the conduct. Defendants PBI's and PSC's wrongful practices were and are injurious to the public interest because those practices were part of a generalized, common, and uniform course of wrongful conduct on the part of Defendants PBI and PSC that applied to all North Carolina Class members and were repeated continuously before and after Defendants PBI and PSC obtained sensitive Personal Information from Plaintiff Williams and North Carolina Class members. All North Carolina Class members have been adversely affected by Defendants PBI's and PSC's conduct, and the public was and is at risk as a result thereof. There are reasonably available alternatives that would further Defendants PBI's and PSC's business interests of increasing revenue. Consumers could not reasonably avoid the harm from Defendants PBI's and PSC's unfair conduct.

379.    As a result of Defendants PBI's and PSC's wrongful conduct, Plaintiff Williams and North Carolina Class members were injured in that they would not have allowed their sensitive Personal Information—the value of which Plaintiff Williams and North Carolina Class members no long have control—to be provided to Defendants PBI and PSC if they had been told or knew that Defendants PBI and PSC failed to maintain sufficient security to keep such data from being hacked and taken by others.

380.    Defendants PBI's and PSC's unfair and/or deceptive conduct proximately caused

Plaintiff Williams' and North Carolina Class members' injuries because, had Defendants PBI and

PSC maintained Personal Information with adequate security, Plaintiff Williams and the North

Carolina Class members would not have lost it.

381.    As a direct and proximate result of Defendants PBI's and PSC's conduct, Plaintiff

Williams and North Carolina Class Members have suffered harm, including but not limited to loss

of time and money resolving fraudulent charges; loss of time and money obtaining protections

against future identity theft; lost control over the value of Personal Information; unreimbursed

losses relating to fraudulent charges; harm resulting from damaged credit scores and information;

and other harm resulting from the unauthorized use or threat of unauthorized use of Personal

Information entitling them to damages in an amount to be proven at trial.

382.    Defendants PBI and PSC acted with willful and conscious disregard of the rights

of others, subjecting Plaintiff Williams and North Carolina Class members to unjust hardship as a

result such that an award of punitive damages is appropriate.

383.    Plaintiff Williams and North Carolina Class members seek actual damages,

compensatory, punitive damages, injunctive relief, and court costs and attorneys' fees as a result

of Defendants' violations of the NCUDTPA. Plaintiff Williams, individually and on behalf of the

North Carolina Class, seeks treble damages pursuant to N.C. GEN. STAT. § 75-16 and an award

of reasonable attorneys' fees pursuant to N.C. GEN. STAT. § 75-16.1.

### COUNT XV
### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
### OHIO REV. CODE § 1345.01, *ET SEQ.*

384.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully

set forth herein.

385.    Plaintiff Patrick brings this claim against PSC on behalf of the PSC Ohio Class,

PBI on behalf of the PBI Ohio Class, DRMS on behalf of the DRMS Ohio Class, and ReliaStar on behalf of the ReliaStar Ohio Class.

386.    Defendants PSC, PBI, DRMS, and ReliaStar, while operating in Ohio, engaged in unfair and deceptive acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code § 1345.01(A) and (B). This includes but is not limited to the following:

    a.   failing to enact adequate privacy and security measures to protect the Ohio Class members' Personal from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach;

    b.   failing to take proper action following known security risks and prior cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.   knowingly and fraudulently misrepresenting that they would maintain adequate data privacy and security practices and procedures to safeguard the Ohio Class members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

    d.   omitting, suppressing, and concealing the material fact of the inadequacy of their privacy and security protections for the Ohio Class members' Personal Information;

    e.   knowingly and fraudulently misrepresenting that they would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the Ohio Class members' Personal Information, including but not limited to duties imposed by the FCRA, 15. U.S.C.§ 1681e, and the GLBA, 15 U.S.C. § 6801 et seq.;

f.  failing to maintain the privacy and security of the Ohio Class members' Personal Information, in violation of duties imposed by applicable federal and state laws, including but not limited to those mentioned in the aforementioned paragraph, directly and proximately causing the Data Breach;

g.  failing to disclose the Data Breach to the Ohio Class members in a timely and accurate manner, in violation of the duties imposed by Ohio Rev. Code § 1349.19(B).

387.   As a direct and proximate result of Defendants PSC's, PBI's, DRMS', and ReliaStar's practices, the Ohio Class members suffered injury and/or damages, including but not limited to time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their Personal Information.

388.   The above unfair and deceptive acts and practices and acts by Defendants PSC, PBI, DRMS, and ReliaStar were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to the Ohio Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

389.   Defendants PSC, PBI, DRMS, and ReliaStar knew or should have known that their computer systems and data security practices were inadequate to safeguard the Ohio Class members' Personal and that risk of a data breach or theft was highly likely. The actions of Defendants PSC, PBI, DRMS, and ReliaStar in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful.

390.   Pursuant to Ohio Rev. Code § 1345.09, Plaintiff Patrick and the Ohio Class members seek an order enjoining Defendants PSC's, PBI's, DRMS', and ReliaStar's unfair and/or

deceptive acts or practices actual damages – trebled (to be proven at the time of trial), and attorneys' fees, costs, and any other just and proper relief, to the extent available under the Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01, et seq.

**COUNT XVI**
**VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT**
**OHIO REV. CODE § 4165.01, *ET SEQ.***

391.     Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

392.     Plaintiff Patrick brings this claim against PSC on behalf of the PSC Ohio Class, PBI on behalf of the PBI Ohio Class, DRMS on behalf of the DRMS Ohio Class, and ReliaStar on behalf of the ReliaStar Ohio Class.

393.     Defendants PSC, PBI, DRMS, and ReliaStar, while operating in Ohio, engaged in deceptive trade practices in the course of their business and vocation, including representing that their services had characteristics that they did not have, representing that their services were of a particular standard or quality when they were not, and advertising their services with intent not to sell them as advertised. in violation of Ohio Rev. Code § 4165.02(A). This includes but is not limited to the following:

    a.    failing to enact adequate privacy and security measures to protect the Ohio Class members' Personal from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach;

    b.    failing to take proper action following known security risks and prior cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

      c.     knowingly and fraudulently misrepresenting that they would maintain adequate data privacy and security practices and procedures to safeguard the Ohio Class members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

      d.     omitting, suppressing, and concealing the material fact of the inadequacy of their privacy and security protections for the Ohio Class members' Personal Information;

      e.     knowingly and fraudulently misrepresenting that they would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the Ohio Class members' Personal Information, including but not limited to duties imposed by the FCRA, 15. U.S.C.§ 1681e, and the GLBA, 15 U.S.C. § 6801 et seq.;

      f.     failing to maintain the privacy and security of the Ohio Class members' Personal Information, in violation of duties imposed by applicable federal and state laws, including but not limited to those mentioned in the aforementioned paragraph, directly and proximately causing the Data Breach;

      g.     failing to disclose the Data Breach to the Ohio Class members in a timely and accurate manner, in violation of the duties imposed by Ohio Rev. Code § 1349.19(B).

394.    As a direct and proximate result of Defendants PSC's, PBI's, DRMS', and ReliaStar's practices, the Ohio Class members suffered injury and/or damages, including but not limited to time and expenses related to monitoring their financial accounts for fraudulent activity,

an increased, imminent risk of fraud and identity theft, and loss of value of their Personal Information.

395.   The above unfair and deceptive acts and practices and acts by Defendants PSC, PBI, DRMS, and ReliaStar were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to the Ohio Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

396.   Defendants PSC, PBI, DRMS, and ReliaStar knew or should have known that their computer systems and data security practices were inadequate to safeguard the Ohio Class members' Personal and that risk of a data breach or theft was highly likely. The actions of Defendants PSC, PBI, DRMS, and ReliaStar in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful.

397.   Pursuant to Ohio Rev. Code § 1345.09, Plaintiff Patrick and the Ohio Class members seek an order enjoining Defendants PSC's, PBI's, DRMS', and ReliaStar's unfair and/or deceptive acts or practices actual damages – trebled (to be proven at the time of trial), and attorneys' fees, costs, and any other just and proper relief, to the extent available under the Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01, et seq.

### COUNT XVII
### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ("UTPCPL"), 73 P.S. §§ 201-1–201-9.3

398.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

399.   Plaintiff Sangl brings this claim against PSC on behalf of the PSC Pennsylvania Class, PBI on behalf of the PBI Pennsylvania Class, and TIAA on behalf of the TIAA Pennsylvania Class.

400.    Defendants PSC, PBI, and TIAA sell and perform services in the Commonwealth of Pennsylvania.

401.    Plaintiff Sangl, Pennsylvania Class members, and Defendants are "persons" as defined by the UTPCPL. 73 P.S. § 201-2(2).

402.    Defendants' services constitute as "trade" and "commerce" under the statute. 73 P.S. § 201-2(3).

403.    Defendants obtained Plaintiff Sangl's and Pennsylvania Class members' Personal Information in connection with the services they perform and provide.

404.    Defendants engaged in unfair or deceptive acts in violation of the UTPCPL by failing to implement and maintain reasonable security measures to protect and secure consumers' (such as Plaintiff Sangl's and Pennsylvania Class members') Personal Information in a manner that complied with applicable laws, regulations, and industry standards, including by failing to control all environments into which it placed consumers' Personal Information, and to ensure that those environments were used, configured and monitored in such a way as to ensure the safety of consumers' data.

405.    As alleged above, Defendants make explicit statements to their customers that their Personal Information will remain private and secure.

406.    The UTPCPL lists twenty-one instances of "unfair methods of competition" and "unfair or deceptive acts or practices." 73 P.S. § 201-2(4). Defendants' failure to adequately protect Plaintiff's and class members' Personal Information while holding out that it would adequately protect the Personal Information falls under at least the following categories:

    a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have (73 P.S. § 201-2(4)(v));

b. Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another (73 P.S. § 201-2(4)(vii));

c. Advertising goods or services with intent not to sell them as advertised (73 P.S. § 201-2(4)(ix)); and

d. Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (73 P.S. § 201-2(4)(xxi)).

407.   Due to the Data Breach, Plaintiff and class members have lost property in the form of their Personal Information. Further, Defendants' failure to adopt reasonable practices in protecting and safeguarding their customers' Personal Information will force Plaintiff and class members to spend time or money to protect against identity theft. Plaintiff and class members are now at a higher risk of identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Defendants' practice of collecting and storing Personal Information without appropriate and reasonable safeguards to protect such information.

408.   As a result of Defendants' violations of the UTPCPL, Plaintiff and class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased or imminent risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Personal Information; (iii) breach of the confidentiality of their Personal Information; (iv) deprivation of the value of their Personal Information, for which there is a well-established national and international market; (v) lost value of the unauthorized access to their Personal Information permitted by Defendants; (vi) the value of long-term credit monitoring and identity theft protection products necessitated by the Data Breach; (vii) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (viii) overpayment for the services that were received without adequate data security.

409.    Pursuant to 73 P.S. § 201-9.2(a), Plaintiff Sangl seeks actual damages, $100, or three times their actual damages, whichever is greatest. Plaintiff Sangl also seeks costs and reasonable attorney fees.

**COUNT XVIII**
**DECLARATORY RELIEF**
**(28 U.S.C. § 2201)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

410.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

411.    An actual controversy has arisen and exists between Plaintiffs and class members, on the one hand, and Defendants on the other hand, concerning the Data Breach and Defendants' failure to protect Plaintiffs' and class members' Personal Information, including with respect to the issue of whether Defendants took adequate measures to protect that information. Plaintiffs and the Class are entitled to judicial determination as to whether Defendants have performed and are adhering to all data privacy obligations as required by law or otherwise to protect Plaintiffs' and class members' Personal Information from unauthorized access, disclosure, and use.

412.    A judicial determination of the rights and responsibilities of the parties regarding Defendants' privacy policies and whether they failed to adequately protect Personal Information is necessary and appropriate to determine with certainty the rights of Plaintiffs and the Class, and so that there is clarity between the parties as to Defendants' data security obligations with respect to Personal Information going forward, in view of the ongoing relationships between the parties.

**PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of the Class, respectfully requests that the Court grant the following relief:

A.      Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiffs as Class Representatives and undersigned counsel as Class Counsel;

B.      Award Plaintiffs and the Class actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C.      Award declaratory and injunctive relief as permitted by law or equity to assure that class members have an effective remedy, including enjoining Defendants from continuing the unlawful practices as set forth above;

D.      Award Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Award Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Award Plaintiffs and the Class such other favorable relief as allowable under law or at equity.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: June 10, 2024                    Respectfully submitted,

By:  *Karen H. Riebel*
Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Ste. 2200
Minneapolis, MN 55401
Tel:  (612) 339-6900
Fax: (612) 612-339-0981
*khriebel@locklaw.com*

E. Michelle Drake
BERGER MONTAGUE, PC
1229 Tyler St., NE, Ste. 205
Minneapolis, MN 55413
Tel:  (612) 594-5933
Fax: (612) 584-4470
*emdrake@bm.net*

Gary F. Lynch
LYNCH CARPENTER, LLP
1133 Penn Ave., 5th Fl.
Pittsburgh, PA 15222
Tel:  (412) 322-9243
Fax:  (412) 231-0246
*Gary@lcllp.com*

Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, 5th Fl.
Washington, DC  20005
Tel:  (202) 408-4600
*dmcnamara@cohenmilstein.com*

Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Ste. 500
Philadelphia, PA 19106
Tel:  (215) 592-1500
Fax: (215) 592-4663
*cshaffer@lfsblaw.com*

*Plaintiffs' Lead Counsel*

Andrea R. Gold
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC 20006
Tel: 202-973-0931
*agold@tzlegal.com*

Gary Klinger
MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC
227 West Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel: (866) 252-0878
*GKlinger@milberg.com*

Marc H. Edelson
EDELSON LECHTZIN LLP
411 S. State Street, Suite N300
Newtown, PA 18940
Tel: (215) 867-2399
*medelson@edelson-law.com*

*Additional Plaintiffs' Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, the foregoing document was served by filing it on the Court's CM/ECF system, which will automatically send a notification of such filing to all counsel of record via electronic mail.

Dated: June 10, 2024                          */s/ Karen H. Riebel*
                                                           Karen H. Riebel